William BOLDEN, III et al.

v.

PENNSYLVANIA STATE POLICE et al.

Civ. A. No. 73–2604.

United States District Court,
E. D. Pennsylvania,
Civil Division.

April 14, 1980.

Harold Goodman, Germaine Ingram, of Community Legal Services, Philadelphia, Pa., for plaintiffs.

John L. Heaton, Asst. Atty. Gen., Chief Counsel, Pennsylvania State Police, Harrisburg, Pa., for Commonwealth defendants.

## MEMORANDUM

CLIFFORD SCOTT GREEN, District Judge.

On November 16, 1973, plaintiff William H. Bolden, III and others commenced this class action to bring an end to pervasive racial discrimination in the hiring and promotion practices of the Pennsylvania State Police. Despite settlement of the class claims by consent judgment on June 20, 1974, litigation concerning various aspects of the suit has continued to this day. We now consider plaintiffs' request for an award of counsel fees and costs to their attorney, Community Legal Services, Inc. ("CLS"). Recovery is sought only from the Commonwealth defendants in their official capacities (hereinafter "defendants") and only on issues with respect to which plain-

tiffs were prevailing parties against those defendants.[1]

## I. FACTUAL BACKGOUND

This historic suit charged the Pennsylvania State Police and several state officials with violating plaintiffs' rights under the thirteenth and fourteenth amendments to the United States Constitution and under 42 U.S.C. §§ 1981, 1983, 1985(3) and 1988. As we summarized the underlying facts earlier, "[t]he evidence . . . of racial discrimination by the Pennsylvania State Police was overwhelming." *Oburn v. Shapp*, 393 F.Supp. 561, 573 (E.D.Pa.1975), aff'd, 521 F.2d 142 (3d Cir. 1975). From 1905 to 1956 the Pennsylvania State Police had *no* black troopers. By the time this action was commenced, there were only sixty-two (62) minorities employed by the State Police out of a total complement of 4,173. While minorities comprised 10.8% of all employees of the Commonwealth of Pennsylvania, they constituted merely 1.48% of the Pennsylvania State Police force. Moreover, of the sixty-two minorities on the Force at the time the suit was brought, sixty were relegated to the lowest rank, that of trooper. Once additional evidence of racial discrimination was revealed by discovery, defendants stipulated that the Commonwealth was aware of the problem. The stipulation said further that certain defendants had attempted to remedy the discrimination but had encountered resistance from the State Police.

After a three week trial on the merits, the parties agreed to the entry of a consent decree. That decree provided comprehensive relief in favor of the plaintiff class. Not only did it enjoin the Commonwealth defendants from persisting in the unlawful discrimination, but it also required them to develop job-related hiring and promotion standards for the first time. Pending Court approval of those permanent criteria,

---

1. For a brief history of other issues in this litigation see *Bolden v. Pennsylvania State Po-* lice, 578 F.2d 912, 914–18 (3d Cir. 1978).

defendants agreed to constitute each future Cadet class with at least one-third qualified minorities and to maintain a minority promotion ratio of at least 25% (one qualified minority for every three qualified non-minorities). Later, when defendants' administrative actions threatened to delay and undermine the employment goals, the Court, after another hearing and over defendants' objections, entered an order modifying the consent judgment and requiring instead the hiring of one qualified minority for each qualified white applicant and the promotion of at least one qualified minority for each two qualified white enlisted members. Memorandum and Order of November 29, 1976.

By agreement of the parties, the individual claims for relief filed by intervening plaintiffs with respect to hiring were not resolved by the consent decree. Instead, those claims were severed for case-by-case disposition. Either by settlement or by litigation, plaintiffs prevailed again.

For its efforts in successfully prosecuting both the individual and the class claims, CLS has been seeking attorneys' fees at least on an amicable basis since October 1974. As the Court's opinion today illustrates, those informal attempts at resolving the matter have failed. On July 25, 1978, plaintiffs filed with the Court their motion for counsel fees and costs. The Commonwealth defendants filed an opposition on August 7, 1978, and one week later, on August 15, 1978, they initiated their first and only discovery effort. Plaintiffs answered defendants' interrogatories and requests for production of documents on September 11, 1978, and, supplementally, on September 29, 1978.

With consent of counsel, we informally held plaintiffs' motion in abeyance pending a change in the elected officers of the Commonwealth and the appointment of new counsel for the defendants. Defendants'

current counsel entered his appearance on June 11, 1979. On August 17, 1979, defendants filed another memorandum of law addressed to the fee petition and, for the first time, requested the Court to hold an evidentiary hearing.

We granted the request and scheduled an evidentiary hearing to adjudicate any factual disputes relevant to plaintiffs' fee petition. See generally, *Lindy Bros. Builders v. American Radiator and Standard Sanitary Corp.*, 487 F.2d 161, 169 (3d Cir. 1974) (*Lindy I*). Upon commencement of the hearing, however, defendants presented to the Court a stipulation stating that they did not proffer, nor did they intend to proffer, any witnesses or exhibits in opposition to the fee motion. Since defendants had offered no evidence earlier, the factual record now before the Court, by express agreement of the parties, consists solely of evidence offered by plaintiffs.

## II. ENTITLEMENT

■ Plaintiffs predicate their entitlement to a fee award mainly on the 1976 Civil Rights Attorneys' Fees Awards Act, 42 U.S.C. § 1988, as amended. Alternatively, they argue that the award is authorized either by section 706(k) of Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e–5(k) (as amended),[2] or by the bad faith and common benefit exceptions to the American Rule on counsel fees. Because we find an explicit statutory basis for the award in the 1976 Fees Awards Act, we need not decide and will not discuss the alternative theories presented by plaintiffs.

The 1976 Fees Awards Act provides, in pertinent part:

. . . In any action or proceeding to enforce a provision of sections [1977, 1978, 1979, 1980 and 1971 of the Revised Statutes] . . . the court, in its discretion, may allow the prevailing party,

---

**2.** On April 10, 1978, plaintiffs were granted leave to amend their complaint to allege a

cause of action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq.

other than the United States, a reasonable attorney's fee as part of the costs. Pub. L. 94–559, 42 U.S.C. § 1988, *as amended.*

Defendants concede that Congress intended the Act to be applicable to cases that were pending on its effective date, October 19, 1976. *Hutto Finney,* 437 U.S. 678, 98 S.Ct. 2565, 2572 n. 23, 57 L.Ed.2d 522. For purposes of applying the Act, however, they argue that *Bolden* should be treated as two distinct cases—a class action and an action consisting of the individual claims of the intervening plaintiffs. Since the class action was reduced to final judgment by the consent decree on June 20, 1974, defendants contend that the class "case" was not pending when the Act became effective and, hence, litigation of the class claims is noncompensable.

We assume, *arguendo,* that *Bolden* may be bifurcated into two cases as defendants suggest. Even so, we cannot conclude that the class action terminated in the consent decree. In providing relief to the class, the consent decree expressly contemplated a continuing judicial proceeding. At the outset, defendants were required to use interim hiring and promotion goals while they developed nondiscriminatory, job-related standards for employment with the Pennsylvania State Police.[3] Once the new standards were developed, defendants were ordered to submit evidence of their validity to both plaintiffs and the Court.[4] Only if the Court found, after an evidentiary hearing, that the standards were in fact valid and job-related could defendants institute them in the selection and promotion of Pennsylvania State Police Officers.[5]

To this day, defendants are still operating under the interim employment goals. Nearly six years after entry of the 1974 consent judgment and four years after passage of the 1976 Fees Awards Act, implementation of the class relief remains in the initial stage. Nor have plaintiffs been responsible for the delay in any way. Defendants simply have not fulfilled their obligation to develop and present to the Court evidence of valid, nondiscriminatory employment standards.

It follows that, when the Act became effective, the class case in *Bolden* was not "pending only in the technical sense that jurisdiction to enter such further orders as were necessary and desirable had been retained." *See Wheeler v. Durham City Board of Education,* 585 F.2d 618, 623 (4th Cir. 1978). It was pending because the parties themselves had provided for further judicial proceedings and those proceedings had not yet occurred. For this reason, we find that the Act is applicable to both the class and the individual claims in *Bolden.*

■ Having decided the threshold question of the Act's applicability, we turn to the central issue in this action, whether plaintiffs are entitled to an award of attorneys' fees. Generally, prevailing plaintiffs should recover fees under the Act unless special circumstances would make the result unjust. *See* Senate Report No. 94–1011, 94th Cong., 2nd Sess. 2, U.S.Code Cong. & Admin.News 1976, p. 5908; *see also Hughes v. Repko,* 578 F.2d 483, 490 (3d Cir. 1978) (concurrence of Rosenn, J.). It is undisputed that plaintiffs have prevailed on both the class and the individual issues for which they seek compensation.[6] Defendants contend, however, that plaintiffs have waived their right to a fee award.

■ The first basis for a waiver cited by defendants is section VII of the consent decree. That section reads as follows:

**VII.** *COSTS AND ATTORNEYS' FEES*

---

**3.** Consent Decree, Section I, ¶¶ 1–3, Section II, ¶¶ A, B.

**4.** Consent Decree, Section I, ¶ 2, Section 2, ¶ B(1).

**5.** Id.

**6.** Defendants concede that intervening plaintiff Raphael Mario Perez is a "prevailing party" within the meaning of the Act. The Court awarded Mr. Perez $49,090.88 in damages. Nevertheless, they suggest that CLS should collect its fee from him rather than from the Commonwealth. We reject this suggestion as unsupported and unwarranted. *See Hughes v. Repko,* 578 F.2d at 488.

The defendants shall pay plaintiffs the sum of three thousand two hundred seventy-nine dollars and five cents ($3,279.05) as reimbursement for the costs of this litigation, said costs including filing fees, transcripts, and reproduction expenses, and fees for expert witnesses.

The defendants shall pay Robert J. Reinstein, Esquire, the sum of seven thousand nine hundred and forty dollars ($7,940.00) as reasonable attorneys' fees in the prosecution of this case.

Because the provision specifically allows attorneys' fees for Robert J. Reinstein, Esq., a private attorney associated as counsel for plaintiffs, but contains no mention of CLS, defendants theorize that the parties intended to waive CLS' right to fees.

In *United States v. ITT Continental Baking Company,* 420 U.S. 223, 238, 95 S.Ct. 926, 935, 43 L.Ed.2d 148 (1970), the Supreme Court observed that a consent decree is to be construed basically as a contract, with reliance upon such aids to construction that are proper in construing any other contract. Looking first to the decree itself, we find no language that expresses the intention asserted by defendants. Nor is there extrinsic evidence of record indicating mutual assent to waive attorneys' fees for CLS, though defendants had ample opportunity to discover and produce such evidence by affidavit or in-court testimony. Finally, there is evidence to support an equally plausible construction of section VII [7]—namely, that the parties reached no agreement insofar as attorneys' fees for CLS were concerned. In light of this evidence and no evidence to the contrary, we cannot construe the silence in section VII as a waiver of CLS' right to fees.

■ Alternatively, defendants contend that a contractual provision between the Pennsylvania Legal Services Center, Inc. ("PLSC") and the Department of Public Welfare of the Commonwealth of Pennsylvania ("DPW") bars an award of attorneys' fees in this action. PLSC is a non-profit corporation which serves as a conduit for the distribution of federal funds from DPW to CLS and other legal services programs operating throughout the Commonwealth. The funds are allocated to DPW under Title XX of the Social Security Act, 42 U.S.C. § 1397 *et seq.,* and they are used by PLSC to provide comprehensive legal services to eligible, indigent persons.

In performing its conduit function, PLSC contracts first with DPW and then with the subordinate legal services programs. The contractual provision at issue here is set forth in Section II, paragraph 2.17 of the PLSC–DPW agreement dated July 1, 1978. It reads as follows:

> The LSPs [legal services plans] and the Corporation [PLSC] shall not request attorneys fees in cases brought against the Commonwealth or Commonwealth employees. In the event that any such attorneys fees are awarded to the Corporation or LSPs, DPW will deduct the amount of the fees so awarded from payments on the next invoice submitted by the Corporation. The Corporation agrees to bind any LSPs which it funds in whole or in part to this provision.

CLS was not a signatory to the PLSC–DPW agreement. Nor did CLS agree to any provision akin to paragraph 2.17 when it negotiated its contract with PLSC.[8] Nevertheless, defendants insist that the prohibition in paragraph 2.17 is binding on CLS.

The only evidence offered to support this contention is the document itself. Defendants have furnished the Court with no background information about the nature of the agreement, the circumstances in which it was negotiated, or the purpose of paragraph 2.17. On the other hand, plaintiffs have submitted affidavits which evidence PLSC's rejection of the Commonwealth's attempt to restrict its right to fees. Al-

---

7. The documents are contained in Exhibit "A" to Plaintiffs' Brief in Reply to the Commonwealth Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for an Award of Counsel Fees and Costs.

8. The CLS–PLSC contract is appended to the Jones Affidavit as Exhibit "A".

though the President and Secretary of PLSC apparently signed the document on May 25, 1978, there is evidence that those officers lacked actual authority to obligate PLSC without formal approval from its Board of Directors. (Thorkelson Affidavit, at ¶ 5.) Moreover, since the signing of the first contract with DPW in 1973, DPW knew that ratification by the Board of Directors was a condition precedent to the effectiveness of the agreements. (Thorkelson Affidavit, at ¶ 5.) On June 29, 1978—two days before the contract was scheduled to take effect—PLSC's Board of Directors met to consider whether to accept, either in whole or in part, the agreement negotiated by its officers. That meeting resulted in a unanimous vote to ratify the contract with the specific exception of paragraph 2.17. (Thorkelson Affidavit, at ¶ 8.)

Defendants have made no attempt to show that the officers of PLSC possessed the actual or apparent authority to negotiate a binding contract with DPW without approval or ratification from PLSC's Board of Directors; plaintiffs have offered evidence to the contrary. Accordingly, a preponderance of the evidence establishes that paragraph 2.17 is not effective to bar an award of attorneys' fees in this action.[9]

## III. CALCULATING THE LODESTAR

■ Determining an appropriate fee for CLS' services in *Bolden* requires a two-step analysis. Preliminarily, the Court must calculate the number of compensable hours spent by counsel that was reasonably necessary to produce the benefit conferred. That number is then multiplied by the reasonable hourly rate for the attorney's services in order to generate a "lodestar" figure. *Lindy I*, 487 F.2d at 166–68. Next, having determined the lodestar, the Court can then increase or decrease it to reflect the contingent nature of success and the quality of the attorney's work. *Lindy I*, 487 F.2d at 168. In addition, the Court must gauge the reasonableness of the fee "in light of the important substantive purposes" of the Civil Rights Act upon which plaintiffs relied. *Hughes v. Repko*, 578 F.2d at 488–89.

Defendants do not actively dispute either the number of hours claimed to have been invested by CLS or the reasonableness of the matters on which work was done.[10] However, they offer passive opposition by contending that plaintiffs have failed to establish the time expended by reliable documentation. *See Baughman v. Wilson Freight Forwarding Co.*, 583 F.2d 1208, 1216 (3d Cir. 1978). As we understand defendants' position, CLS should not be compensated for those hours that are based upon "reconstructions" instead of contemporaneous time records.

■ While it is true that "mere estimates of time" are not acceptable, attorneys' fees have been allowed where time records are substantially reconstructed and are reasonably accurate. *See Lindy Bros. Builders, Inc. of Philadelphia v. American Radiator & Standard Sanitary Corp.*, 382 F.Supp. 999, 1011 (E.D.Pa.1974), *remanded on other grounds*, 540 F.2d 102, 109 (3d Cir. 1976). The affidavits and answers to interrogatories filed by plaintiffs' attorneys in this action show that the reconstructions were made only after a careful review of the correspondence, pleadings, briefs and other papers on file. In addition, the attorneys conferred with each other to ensure that there was no unnecessary duplication of the time logged. Since CLS has separated the hours claimed according to each attorney and to each aspect of the litigation, both the defendants and the Court have had an

---

**9.** Even if the Court assumed that paragraph 2.17 were effective, plaintiffs have offered additional reasons why the provision would not bar an award of attorneys' fees in this action. According to plaintiffs, *Bolden* is not within the scope of paragraph 2.17 because this suit was financed with non-Title XX funds and the request for attorneys' fees was made before the provision's intended effective date. We do not reach these issues, the Commonwealth having failed to sustain its burden of demonstrating the effectiveness of paragraph 2.17.

**10.** Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for an Award of Counsel Fees and Costs, at p. 26.

opportunity to examine in detail the reconstructions. Defendants do not now contest their accuracy, and after our own independent review, we accept the evidence as sufficient to establish the amount of time expended.

Throughout this protracted litigation, plaintiffs have been represented by three attorneys from CLS.[11] They are Harold Goodman, Germaine Ingram and David Kraut. In addition, CLS seeks compensation for the services of Stuart Wilder, a law student and legal intern who assisted in the preparation of motions and other documents.

The Court finds that Harold Goodman, lead counsel, spent a total of 965.5 hours representing plaintiffs on issues on which plaintiffs were prevailing parties with respect to the Commonwealth defendants. Ms. Ingram devoted 191.5 hours to the prosecution of those issues, and Mr. Kraut invested 71 hours with regard to those issues. The Court finds further that Mr. Wilder spent a total of 191 hours assisting counsel. In passing, we note that some of the above hours represent time spent on the fee petition itself. See *Prandini v. National Tea Co.*, 585 F.2d 47, 54 (3d Cir. 1978). Having carefully reviewed the submissions of both plaintiffs and the Commonwealth defendants, and with the benefit of our own knowledge of the case, we also find that the number of hours spent by counsel was reasonably necessary to produce the benefit conferred.

In order to calculate the lodestar, we must next fix a reasonable hourly rate for each attorney. Though plaintiffs have requested the use of "average" hourly rates as a means of compensating them for the delay in receipt of payment, we believe the better method is to use "historical" rates, the rates that would have been reasonable at the time the services were in fact rendered. See *Vecchione* [*Vecchione v. Wohlgemuth*], 481 F.Supp. [776] at 790 [(E.D.Pa. 1979)].

---

11. Until the entry of the consent decree, plaintiffs also were represented by Robert Reinstein, Esq., a private attorney.

### Harold Goodman

Harold Goodman has been lead counsel for plaintiffs since the commencement of this action on November 16, 1973. He has been Project Chief of CLS' Employment Law Project for the last eight years and an attorney at CLS since 1969. In that time he has litigated several employment discrimination cases, of which the most widely known is probably *Commonwealth of Pennsylvania v. Local Union 542, Intern. U. of Operating Engineers*, 469 F.Supp. 329 (E.D. Pa.1978) (liability decision). Mr. Goodman enjoys an excellent reputation in the field of employment discrimination law.

Mr. Goodman has requested the following historical rates, based on a schedule adopted by his office:

| Year | Hourly Rate |
|------|-------------|
| 1973 | $ 60.00 |
| 1974 | $ 70.00 |
| 1975 | $ 80.00 |
| 1976 | $ 90.00 |
| 1977 | $100.00 |
| 1978 | $110.00 |
| 1979 | $120.00 |

We express no opinion on the validity of the schedule; however, we find these rates entirely reasonable for the services of Mr. Goodman.

The lodestar for Mr. Goodman's work is thus $81,725.00, computed as follows:

| Year | Hours | Total (Hours x Rate) |
|------|-------|----------------------|
| 1973 | 60 | $ 3,600.00 |
| 1974 | 447 | $31,290.00 |
| 1975 | 110 | $ 8,800.00 |
| 1976 | 8 | $ 720.00 |
| 1977 | 0 | – – – – – |
| 1978 | 253.5 | $26,875.00 |
| 1979 | 87 | $10,440.00 |
| Total | 965.5 | $81,725.00 |

### Germaine Ingram

Germaine Ingram has been employed as an attorney at CLS since September 1, 1975. From 1972 to 1975 she was employed as Assistant Professor of Law at Temple Uni-

versity teaching in the areas of Constitutional Law and Juvenile Rights, among others. In the academic year 1974–1975 Ms. Ingram was a Harvard Fellow in Law and Humanities. Her academic experience is entitled to weight in determining a reasonable rate for her services.

We compute the lodestar for Ms. Ingram's work as follows:

| Year | Hours | Rate | Total |
|------|-------|------|-------|
| 1975 | 4 | $50.00 | $ 200.00 |
| 1976 | 56 | $60.00 | $ 3,360.00 |
| 1977 | 14 | $70.00 | $ 980.00 |
| 1978 | 6.75 | $80.00 | $ 540.00 |
| 1979 | 109.75 | $90.00 | $ 9,877.50 |
| Total | 191.5 | | $14,957.50 |

We consider the above rates reasonable in light of Ms. Ingram's academic accomplishment, expertise in the field of employment discrimination, and the comparable fees she could have charged had she been employed in a private, fee-generating practice.

### David Kraut

David Kraut has been employed as an attorney at CLS since September, 1973. He commenced work on the *Bolden* litigation in September, 1975. We find the reasonable rates for his services to be $60.00 in 1976, $70.00 in 1977 and $80.00 in 1978. The lodestar for Mr. Kraut's work is $4380, computed as follows:

| Year | Hours | Rate | Total (Hours x Rate) |
|------|-------|------|----------------------|
| 1976 | 60 | $60.00 | $3,600.00 |
| 1977 | 10 | $70.00 | $ 700.00 |
| 1978 | 1 | $80.00 | $ 80.00 |
| Total | 71 | | $4,380.00 |

Again, we note that the above rates are reasonable in light of Mr. Kraut's experience and the prevailing rates charged by private attorneys in the City of Philadelphia with comparable experience.

### Stuart Wilder

■ Stuart Wilder was employed as a student intern at CLS during 1978 and 1979. He is now a member of the Pennsylvania Bar, having graduated from Temple University School of Law in May, 1979. During law school, Mr. Wilder was a staff member of the *Temple Law Quarterly*. Defendants contend that his services were part of the office overhead and as such are noncompensable. They cite *Scheriff v. Beck*, 452 F.Supp. 1254, 1261 (D.Colo.1978), which held that "[u]nder the civil rights fees statutes the court cannot award any sums for the work of law clerks or paralegal assistants."

The view expressed by the district court in *Scheriff* has never been adopted in this judicial circuit. *See, e. g., Wehr v. Burroughs Corp.*, 477 F.Supp. 1012, 1017 (E.D. Pa.1979); *Commonwealth of Pennsylvania v. O'Neill*, 431 F.Supp. 700, 711 (E.D.Pa. 1977). We note further that Mr. Wilder's work, if performed by a lawyer, would have been much more costly and that, traditionally, private firms in the Philadelphia area bill clients for paralegal services. We find that the $35/hour fee requested for Mr. Wilder's services is reasonable given the prevailing rates for paralegals and student interns. The lodestar for Mr. Wilder is thus $6,685.00 ($35/hour × 191 hours).

## IV. ADJUSTMENTS TO THE LODESTAR

The lodestar for all services rendered by CLS in representing plaintiffs on issues with respect to which plaintiffs were prevailing parties against the Commonwealth defendants is $107,747.50. Plaintiffs ask the Court to triple this amount to reflect the quality of the representation, the unique demands of the litigation, the nature of the benefit obtained, and their delay in receiving compensation. As explained more fully below, we will increase the lodestar, but only by a factor of 50%.

*Lindy I* permits an adjustment in the lodestar to reflect the "contingent nature of success." *Lindy I*, 487 F.2d at 168. Plaintiffs do not contend that success in *Bolden* was unlikely. Under the rubric of contingency, however, they ask the Court to compensate CLS for the delay experienced in recovering its fee. See generally *Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.*, 540 F.2d 102, 117 (3d Cir. 1976) ("*Lindy II*"). The record

does not reveal that the Commonwealth acted in bad faith in opposing fees for CLS. Additionally, we note that the Act authorizing the award was not passed until October, 1976 and that plaintiffs first petitioned the Court for an award in July of 1978. In these circumstances, we decline to increase the lodestar on the ground of delay.

We will make an adjustment in recognition of the high quality of CLS' services. *Lindy I*, 487 F.2d at 168-69. We are cognizant of the admonition in *Lindy II* that "the quality of an attorney's work *in general* is a component of the reasonable hourly rate . . ." and that therefore a consideration of the quality necessarily inheres in the lodestar itself. *Lindy II*, 540 F.2d at 117. Here, however, the skill displayed by CLS significantly shortened the litigation and produced a result just to all. In limited but highly effective discovery, CLS obtained evidence that assured success. After a three week trial on the merits, CLS negotiated a consent decree that provided broad relief in favor of the plaintiff class. Moreover, the decree mandated continuous judicial supervision of defendants' actions, thereby ensuring plaintiffs that they would actually obtain the entitled relief. Equally important, CLS secured compensatory agreements for the individual plaintiffs, again saving many additional hours of litigation. We will increase the lodestar by 20% to reward CLS for the excellent quality of its services.

Finally, we will evaluate the fee to be awarded in light of the important substantive purposes of the Civil Rights Acts. *See Hughes v. Repko*, 578 F.2d at 492. Preliminarily, we observe that the legal theory advanced by plaintiffs was hardly novel. Their claims were founded upon established fourteenth amendment and statutory rights. This fact, however, in no way diminishes the contribution of the action to the purposes of the Civil Rights Acts. Indeed, it would be anomalous to reason that the elimination of a persistent violation of recognized constitutional rights is of less value than the elimination of a theretofore unacknowledged constitutional right. *See generally, Hughes v. Repko*, 578 F.2d at 491 (concurrence of Garth, J.).

In a statewide desegregation action of this magnitude, there are tangible benefits flowing directly to the citizenry of the Commonwealth. Before *Bolden*, racial discrimination in the Pennsylvania State Police was pervasive and flagrant. It was so entrenched that the Governor of the Commonwealth conceded he could not eliminate it— and he had failed in the attempt. As a consequence of *Bolden*, minorities have access to employment in the Pennsylvania State Police on a nondiscriminatory basis, and the citizens of Pennsylvania will have a representative law enforcement agency that is not tainted by constitutional illegality. These factors justify an increase in the lodestar to reflect the importance of this action to the cause of civil rights. In light of these considerations, we will adjust the lodestar upward by 30%.

Since the work performed on the fee petition was "incurred apart from the prosecution of the main case," we will not apply the adjustments to it. *See Baughman*, 583 F.2d 1208 at 1219. We will also factor out the amount awarded for the services of Stuart Wilder, the law student intern. Accordingly, the lodestar to which we apply the adjustment is $88,450.00 ($107,747.50 minus the fee lodestar, $12,612.50, and the Wilder Lodestar, $6,685.00). The amount of the adjustment is $44,225.00. The total award for attorneys' fees is thus $151,972.50 ($88,450.00 plus $44,225.00 plus $12,612.50 plus $6,685.00).

## V. COSTS

Defendants concede that plaintiffs should recover reproduction, transcription and other costs totalling $1,920.70. *See* Fed.R.Civ.P. 54(d); 28 U.S.C. §§ 1920, 1923. They argue, however, that the compensation to be allowed for plaintiffs' statistical expert, Dr. Bernard Siskin, should be that allowed for any other witness under 28 U.S.C. § 1821.

Because Dr. Siskin's testimony was helpful to the Court and played an important role in the ultimate resolution of the issues, we believe it equitable to allow CLS to

recover his $1,200 fee as a cost. *See Commonwealth of Pennsylvania v. O'Neill*, 431 F.Supp. 700, 713–14 (E.D.Pa.1977).