**Jack SHADIS, et al.**

v.

**Frank S. BEAL, et al.**

**Civ. A. No. 75–3421.**

United States District Court, E. D. Pennsylvania.

Aug. 17, 1981.

Joseph Stein, Community Legal Services, Philadelphia, Pa., for plaintiffs.

Maria Vickers, Philadelphia, Pa., for defendants.

## MEMORANDUM AND ORDER

NEWCOMER, District Judge.

Plaintiffs, as the prevailing party in this case move for an award of attorneys' fees to their attorney, Community Legal Services ("CLS"). Defendants argue that CLS is barred from accepting any such award.

The *Shadis* litigation was a class action brought against several Commonwealth employees on behalf of indigent persons who allegedly were deprived of certain medical benefits to which they were entitled under a Medical Assistance program funded and administered by the Commonwealth.

CLS and other legal services programs ("LSP") acquire funds under the joint federal state title XX program through the Pennsylvania Legal Services Center ("PLSC"), a nonprofit corporation formed by the Commonwealth. Pursuant to this funding arrangement, CLS entered into a series of annual contracts with PLSC for the fiscal years 1978–1981, during which CLS performed much of the work in preparation of this case. The contracts for the fiscal periods 1979–1980 and 1980–1981 contain provisions which allegedly prevent CLS from requesting attorneys' fees arising out of litigation against the Commonwealth or Commonwealth employees.

■ Defendants initially argue that the CLS–PLSC funding contracts for 1979–1981 prevent CLS from requesting attorneys' fees generated in the fiscal year 1978–1979 because CLS did not file its request for fees until July, 1980. Defendants argue that the primary funding contract for 1979–80 between PLSC and its fundings source, the Commonwealth Department of Public Welfare contains language to the effect that the LSP, including CLS, "may not accept attorneys' fees in any cases brought against the Commonwealth." Regardless of the validity of such a provision and its power to bind CLS, it does not exclude fees for work done before the contracts went into effect. Moreover, the Court does not find the cases cited by defendant concerning the applicability of changes in statutory laws helpful to its consideration of the contract issues here. The Court finds that the funding contracts between PLSC and DPW and between PLSC and CLS for each of the three fiscal periods pertain only to fees generated by CLS in each of those periods.

1. *The 1978–1979 Contract: Collateral Estoppel and Res Judicata*

■ Defendants argue that CLS is precluded by a contract between DPW and PLSC from requesting legal fees generated during the fiscal year 1978–1979. That contract provided in pertinent part that "the LSPs and the corporation [PLSC] shall not request attorneys' fees in any case against

the Commonwealth or Commonwealth employees." Precisely the issue of whether this contract prevents CLS from requesting legal fees for work done in 1978–1979 in a case against the Commonwealth or its employees was before Judge Green in *Bolden v. Pa. State Police*, 491 F.Supp. 958 (E.D.Pa. 1980).

The *Bolden* case was a class action in which plaintiffs alleged racial discrimination in the hiring and promotion practices of the Pennsylvania State Police. The parties agreed to the entry of a consent decree, later modified by the court, which substantially gave the plaintiff class the relief it sought. CLS, attorney for the class, moved for an award of attorneys' fees. Judge Green held that because CLS was not a signatory to the 1978–1979 PLSC–DPW contract and because the provision in question was not ratified by the PLSC board of directors as required, the DPW–PLSC contract did not bar CLS from requesting attorneys' fees for work done in the fiscal year 1978–1979.

▮ Plaintiffs contend that, in light of the *Bolden* holding, defendant is barred from asserting the 1978–1979 DPW–PLSC contract provision as a defense by the doctrine of res judicata. Defendants, on the other hand, take the position that the doctrine of collateral estoppel rather than res judicata applies. Defendants argue that since, under the facts here, plaintiffs are urging an "offensive" collateral estoppel, the applicability of the *Bolden* court's holding to the contract defense raised in *Shadis*

is to be evaluated according to the criteria set forth in *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326, 99 S.Ct. 645, 649, 58 L.Ed.2d 552 (1979).[1] This Court finds that defendants are collaterally estopped from asserting the contract as a defense. It is, therefore, unnecessary to determine whether res judicata applies.[2]

In the *Parklane* case, the Supreme Court decided "not to preclude the use of offensive collateral estoppel, but to grant trial courts broad discretion to determine when it should be applied." *Parklane*, 493 U.S. 322, 331, 99 S.Ct. 645, 651, 58 L.Ed.2d 552. The Court then provided the following guidelines for trial courts: "The general rule should be that in cases where a plaintiff could easily have joined in an earlier action or where . . . the application of offensive estoppel would be unfair to a defendant, a trial judge should not allow the use of offensive collateral estoppel." *Parklane*, 493 U.S. at 331, 99 S.Ct. at 652.

The *Parklane* Court's concern regarding the offensive use of collateral estoppel stemmed from an interest in judicial economy and the potential unfairness to a defendant whose position on an issue is precluded by a prior judgment involving that defendant or a party privy and a different plaintiff. None of the Supreme Court's objectives is compromised by application of the doctrine in this case. The Commonwealth had the same opportunities in *Bolden* to make its case as it does in *Shadis*. The Commonwealth should have known

1. An offensive use of "collateral estoppel occurs when the plaintiff seeks to foreclose defendant from litigating an issue defendant has previously litigated unsuccessfully in an action with another party." *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 n.4, 99 S.Ct. 645, 649 n.4, 58 L.Ed.2d 552 (1979).

2. If plaintiffs' motions for attorneys' fees in *Shadis* and *Bolden* are considered rights of action separate from plaintiffs' original class action claims, then these rights of action are identical. Under this view, the *Bolden* court's adjudication of a cause of action identical to that in *Shadis* and the identity of the parties to the motions (CLS and two agencies privy to the Commonwealth), *see generally* 1B Moore's Federal Practice ¶ .411 (2d ed. 1974), are sufficient

to permit plaintiffs to invoke the doctrine of res judicata to bar defendants' contract defense in *Shadis*. *Lawlor v. National Screen Service Corp.*, 349 U.S. 322, 326, 75 S.Ct. 865, 867, 99 L.Ed. 1122 (1955). If the request for attorneys' fees is not separable from the original cause of action, then by virtue of the non-identity of the original causes of action in *Shadis* and *Bolden*, defendants' contract defense in *Shadis* is not res judicata. *Cromwell v. County of Sac*, 94 U.S. 351, 352, 24 L.Ed. 195 (1877). However, defendants may still be barred from raising the contract defense by the doctrine of collateral estoppel, which does not require that the causes of action be identical. *Cromwell*, 94 U.S. 351 at 352, 24 L.Ed. 195.

when it had the opportunity fully and fairly to litigate the issue in *Bolden* that CLS would seek attorneys' fees from it for 1978–1979 in connection with other law suits. Finally, and importantly, judicial economy would not be served by relitigating the 1978–1979 contract issue before this court.

■ Defendants also contend that collateral estoppel should not apply because they are not identical parties to, or in privity with, the defendants in *Bolden*. The Court finds, however, that the defendants in *Shadis* and *Bolden* are aligned such that collateral estoppel may apply. In both cases, defendants were agencies or individuals employed by agencies of the Commonwealth. The Commonwealth is surely interested in the outcome of all litigation involving its various agencies. The privity between the Commonwealth and its agencies, the State Police, and the DPW, is sufficient to extend the estoppel by judgment to the Commonwealth. *Chicago, R.I. & P. Ry. Co. v. Schendel*, 270 U.S. 611, 618, 46 S.Ct. 420, 423, 70 L.Ed. 757 (1926).

The Court therefore concludes, for the reasons stated above, that defendant is precluded from raising the 1978–1979 PLSC–DPW contract as a defense to plaintiffs' request for attorneys' fees for work done in that fiscal year.

Finally, although this Court concludes that collateral estoppel bars the contractual defense raised by defendant, the Court is persuaded by the reasoning of Judge Green's opinion in *Bolden*, and would be inclined to follow *Bolden* if defendants were not estopped in this case.

## 2. The 1979–1980, 1980–1981 Contracts: Public Policy

Plaintiffs argue that the contractual term to which they were forced to agree should be found unenforceable because it is void as contrary to public policy.

In determining which rules of law to apply in deciding this issue, the Court notes that the Court of Appeals for this Circuit has suggested in a case treating similar issues that the rules of contract law in the

Commonwealth of Pennsylvania should apply. *Westmoreland Hospital Ass'n. v. Blue Cross, et al*, 605 F.2d 119, 123 (3d Cir. 1979) *cert. denied*, 444 U.S. 1077, 100 S.Ct. 1025, 62 L.Ed.2d 759 (1980). (Insurance contract provisions deducting federal mental health staff grants from computation of hospitals' costs of operation not void as contrary to public policy). *Westmoreland* does not, however, necessarily govern this case. In the first place, the district court in *Westmoreland* found no public policy that was contradictory to the effect or purpose of the contracts, and the Court of Appeals adopted its analysis, *Westmoreland*, 605 F.2d at 125. Having not found any conflict between the contracts and the alleged public policy, the issues of resolving that conflict were never actually reached. In the second place, the fundamental claim in this case is not based on contract, as was the claim in *Westmoreland*. Instead, this is a federal civil rights claim, a part of which is a claim for attorneys' fees, to which a contract is raised as a defense.

■ Having concluded that it is not bound by any inference that might be drawn from *Westmoreland*, the Court further concludes that it is to federal law that it must turn for the rules of decision. Of course, this is in part a contracts question, and the Pennsylvania law of contracts would seem germane, but more fundamentally it is an issue of federal question litigation, federally guaranteed rights, and a federal policy of inducing lawyers to bring actions such as this one. This is not at its root a contracts claim, but rather a fees request to which defendants have raised a contracts defense. Therefore, although the Pennsylvania law of "illegal" contracts may be instructive, the Court concludes that it is an issue of federal law that it must now decide.

■ As a general rule, courts will not enforce contractual provisions that are illegal, and illegal in this sense has been defined as "if either its formation or its performance is criminal, tortious, or otherwise opposed to public policy." Restatement of Contracts § 512 (1932) *quoted in*

*Contractor Industries v. Zerr*, 241 Pa.Super. 92, 97, 359 A.2d 803, 805 (1976). In this case, however, the Court is not presented with a contract that is illegal in the narrow sense; that is, the contract is not prohibited by any express rule of law. Instead, the contract here seems to function in such a way as to counteract through economic duress an important public policy that is carried out through economic inducement. No case cited to the Court, or uncovered through this Court's research, treats this kind of "contrariness" to public policy. The Restatement of Contracts, however, provides a useful list of considerations. Section 320 of Restatement (Second) of Contracts (Tent. Draft No. 12, 1977) reads as follows:

WHEN A TERM IS UNENFORCEABLE ON GROUNDS OF PUBLIC POLICY.

(1) A promise or other term of an agreement is unenforceable on grounds of public policy if legislation provides that it is unenforceable or if the interest in its enforcement is clearly outweighed in the circumstances by a public policy against the enforcement of such terms.

(2) In weighing the interest in the enforcement of a term, account is taken of

(a) the parties' justified expectations,

(b) any forfeiture that would result if enforcement were denied, and

(c) any special public interest in the enforcement of the particular term.

(3) In weighing a public policy against enforcement of a term, account is taken of

(a) the strength of that policy as manifested by legislation or judicial decisions,

(b) the likelihood that a refusal to enforce the term will further that policy,

(c) the seriousness of any misconduct involved and the extent to which it was deliberate, and

(d) the directness of the connection between that misconduct and the term.

Pennsylvania law is not to the contrary. In *Kuhn v. Buhl*, 251 Pa. 348, 96 A. 977 (1916), the Pennsylvania Supreme Court quoted certain legal authorities approvingly.

[T]he relevant applicable principles are well stated in the following excerpts from the authorities: 'Where a contract belongs to a class which is reprobated by public policy, it will be declared illegal though in that particular instance no actual injury may have resulted to the public, as the test is the evil tendency of the contract and not its actual result: 15 A.M. & Eng. Encyc. of Law (2d Ed.), 934. In other words, its validity is determined by its general tendency at the time it is made, and if this is opposed to the interests of the public it will be invalid, even though the intent of the parties was good and no injury to the public would result in the particular case. The test is the evil tendency of the contract and not its actual injury to the public in a particular instance: 9 Cyc. 481–2. In the absence of any legislative prohibition of a particular agreement which may be brought before a court, the latter, to declare it void on this ground, must find that such contracts have a tendency to injure the public—are against public good, or inconsistent with sound policy and good morals as to the consideration or thing to be done: 9 Cyc. 482. Whether a contract is against public policy is a question of law for the court to determine from all of the circumstances in each case. It is clearly to the interest of the public that persons should not be unnecessarily restricted in their freedom to make their own contracts and agreements, therefore they are not to be held void as being contrary to public policy unless they are clearly contrary to what the legislature or judicial decision has declared to be the public policy, or they manifestly tend to injure the public in some way. On the other hand the interests of the public do require that there shall be some restrictions on the freedom of persons to enter into contracts; and if an agreement binds a party to do or not to do anything the doing or omission of

which is manifestly injurious to the public interests, the courts must declare it contrary to public policy, and therefore illegal and void: 9 Cyc. 483–5.

*Kuhn v. Buhl*, 251 Pa. 348, 369–70, 96 A. 977 (1916).[3]

■ The public policy underlying the Civil Rights Attorneys' Fees Awards Act has been discussed at length elsewhere.[4] Certainly, the legislative history of § 1988 is clear and unambiguous as to the federal policy envisioned by the drafters. *See Custom v. Quern*, 482 F.Supp. 1000, 1003 (N.D. Ill.1980). The statute was enacted to prompt the vigorous enforcement of the civil rights laws, "and to achieve uniformity in those statutes and justice for all citizens." H.R.Rep.No.94–1558, 94th Cong., 2d Sess. 1, 19 (1976). The Senate Committee on the Judiciary found the awarding of attorneys' fees to be "essential" to the full enforcement of the federal civil rights laws, and "an integral part of the remedies necessary to obtain ... compliance" with those laws. S.Rep.No.94–1011, 94th Cong., 2d Sess. 5, *reprinted in* [1976] U.S.Code Cong. & Ad.News 5908, 5913.

An important part of the enforcement scheme designed by Congress is the collection of attorneys fees from the states when states are the losing defendants. Explicit in this element is Congress's realization that states and state officials are very often the targets of civil rights actions.

> [D]efendants in these cases are often state or local bodies or state local officials. In such cases, it is intended that attorneys' fees, like other items of costs, will be collected either directly from the official, in his official capacity, from funds of his agency or under his control, or from the State or local government (whether or not the agency or government is a named party).

Senate Report No. 94–1011, 2d Sess. 5, *reprinted in* [1976] U.S.Code Cong. & Ad. News 5908, 5913, (footnotes omitted).

The attorneys' fees scheme was a time-tested method by 1976 when the Civil Rights Attorneys' Fees Award Act was enacted and Congress was familiar with the method by which its policy would be carried out. As the Senate Committee on the Judiciary recognized, "[t]he idea of the 'private attorney general' is not a new one.... We have, since 1870, authorized fee shifting under more than 50 laws." Senate Report No. 94–1011 at 3, U.S.Code Cong. & Admin. News 1976 at 5910. Congress expected that private lawyers who might otherwise refuse to represent indigent clients with meritorious civil rights claims would be induced to take those cases by the prospect of substantial fee awards made to prevailing plaintiffs. The success of the scheme in this regard is clear beyond dispute.

■ It is also clear beyond dispute that legal aid societies are entitled to attorneys' fees, and that the case here may be characterized as precisely the kind of litigation that Congress intended to encourage through the Civil Rights Attorneys' Fees Act. In this case, the Court granted injunctive and declaratory relief to two plaintiff classes. The classes comprised, in the first class, recipients and, in the second class, applicants for medical assistance to the medically needy. The first class succeeded in proving that the state program conflicted with federal regulations. The second class succeeded in showing that medical assistance benefits were unconstitutionally terminated. *Shadis, et al v. Beal, et al*, Civil Action No. 75–3421 (E.D.Pa. August 10, 1976) (Order granting declaratory and injunctive relief on liability issues.)[5]

■ In asserting its contractual defense, the Commonwealth argues that it should be permitted to erect a compensation system

---

**3.** The issue of what remains if a contract term is found to be void is discussed below.

**4.** *See, e. g., Hutto v. Finney*, 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978); *Riddell v. Nat'l Democratic Party*, 624 F.2d 539, 543 (5th Cir. 1980); *Dennis v. Chang*, 611 F.2d 1302,

1306 (9th Cir. 1980); *Custom v. Quern*, 482 F.Supp. 1000, 1004 (N.D.Ill.1980).

**5.** The damages claims were subsequently settled. *Shadis v. Beal*, Civil Action No. 75–3421 (E.D.Pa. December 28, 1979) (Order approving settlement of damages claims).

for CLS apart from the national scheme created by Congress. It states, "The contracts between the Commonwealth, PLSC and CLS have met the interests of the Act and in a way that is probably more useful to low income persons and legal aid agencies than sole reliance on the act. The Commonwealth has given the agencies funds in advance. . . ." Defendants' Supplementary Brief in Opposition to Plaintiffs' Motion for Attorneys' Fees at 7. The Court disagrees with the contention that the contracts here "have met the interests of the Act."

It is quite clear, and courts have recognized, that CLS, in "rationing" its resources must take into account the likelihood of obtaining attorneys' fees.[6] Like any private lawyer, CLS must remain within a budget, and only do the legal work that it can afford to do. What the Commonwealth has attempted to do here is to buy immunity from CLS lawyers. In return for a steady partial subsidy, the Commonwealth has demanded[7] that CLS not seek attorneys' fees awards in cases brought against the Commonwealth. The obvious effect of this, if the agreement is enforced, is to cause CLS not to bring actions against the Commonwealth. In end result, an important member of the plaintiffs' civil rights bar would be removed from the scene, and the vigorous enforcement of the civil rights laws would be materially quelled. *Dennis v. Chang*, 611 F.2d 1302, 1306–7 (9th Cir. 1980).

The situation is exacerbated by the nature of particular defendants in this case. This Court has serious doubts that any contractual term immunizing a defendant from the Civil Rights Attorneys' Fees Awards Act provisions would be enforceable,[8] but

here, where awards in cases brought against this particular class of defendants are specifically intended by Congress, the contradiction of public policy by the contract is palpable. The Court must include that factor in assessing the conflict between the Act and the contractual term. This is not just a random, individual defendant who has opted out of the national scheme; this defendant is among the most significant targets of the lawsuits Congress meant to encourage. In short, Congress has made a clear and unambiguous statement that a certain kind of lawsuit is to be encouraged. This lawsuit is of that kind. The Court finds that the contractual term relied upon by the Commonwealth operates to diminish the likelihood of this kind of lawsuit being brought. The enforcement of this contractual term is therefore contrary to public policy. The only remaining issue to be resolved is whether the term should therefore be considered void.

In weighing the interest in the enforcement of the term against the public policy against enforcement of a term, the Court observes that the public policy embodied in Section 1988 is a vital one. Congress could not have been clearer in its intent or in the seriousness it attached to the attorneys' fees provisions. The use of words such as "essential" and "integral" is prevalent in the legislative history and in the cases construing the act. The policy is, quite clearly, an important one. By contrast, the Court has difficulty in ascribing much importance to the enforcement of the contract. The three factors listed in the Restatement under "weighing the interest in the enforcement of a term," *see* Restatement (2d) of Contracts (Tent. Draft No. 12, 1977) § 320,

6. *E. g., Rodriquez v. Taylor*, 569 F.2d 1231, 1245 (3d Cir. 1977).

7. "Demanded" is accurate usage. CLS protested from the first year in which the contract term was proposed that the bar to seeking attorneys' fees was improper and contrary to public policy.

8. Contracting not to accept fee awards against an entity or person damages Congress' national policy when any lawyer does it, because it

creates an inducement, however subtle, not to bring actions against that putative defendant. The critical element is that the agreement is a prior restraint on the lawyer's decision-making. If such agreements were enforceable, the entity or person could programmatically require such agreements from any number of lawyers with whom it deals, thus diminishing the scope and vitality of the inducement Congress wished to create.

give little support to the Commonwealth's position. The parties' expectations were divergent,[9] and the Court can perceive neither "forfeiture" if enforcement were derived,[10] nor "any special public interest in the enforcement" of the term.[11]

The Commonwealth may legally decide to reduce its funding of CLS. This was Hawaii's response, *see Dennis v. Chang,* 611 F.2d 1302, 1307 n.15 (9th Cir. 1980). It may decide to stop funding CLS altogether. What it may not do is contract with CLS in such a way that CLS will be deterred from bringing civil rights cases against it. For that reason, the Court will decline to enforce the agreement that purports to bar an award of attorneys' fees to CLS.

The Commonwealth argues that this conclusion by the Court renders the entire funding contract void. The cases cited by the Commonwealth, *City of Pittsburg v. Goshorn,* 230 Pa. 212, 79 A. 505 (1910) and *Dippel v. Brunozzi,* 365 Pa. 264, 74 A.2d 112 (1950) do not support that broad contention.[12] In addition, the Restatement explicitly refers to a "term" of an agreement. However, the Court need not rule on the issue of what remains of the CLS contract because the only issue before it is the adequacy of the defense to the attorneys' fees request.

The parties have informed the Court informally that a partial settlement has been reached, and that they have agreed on the value of the services rendered to the class by CLS. The Court will order that the parties file a stipulation to that effect and judgment will be entered on the stipulated award.

## ORDER

AND NOW, this 17th day of August, 1981, it is hereby ORDERED that Plaintiffs' Motion for an Award of Attorneys' Fees is GRANTED.

**9.** Restatement (2d) Contracts (1977) § 320(2)(a).

**10.** *Id.* § 320(2)(b).

**11.** *Id.* § 320(2)(c).

The parties shall file a stipulation as to the amount previously agreed upon.

AND IT IS SO ORDERED.

**12.** The cases do not address, for example, the issue of divisibility. *Cf. Sidco Paper Co. v. Aaron,* 465 Pa. 586, 351 A.2d 250 (1976).