Jack SHADIS, Belle Feinberg, Marie Burton, Individually and on behalf of all other persons similarly situated, Appellees,

v.

Frank BEAL, Individually and as Secretary of the Department of Public Welfare, Commonwealth of Pennsylvania, Wilbur E. Hobbs, Individually and as Deputy Secretary of the Department of Public Welfare, Southeastern Region, Commonwealth of Pennsylvania, Leo A. Sullivan, Individually and as Welfare Policy Specialist, Office of Basic Family Maintenance, Department of Public Welfare, Southeastern Region, Commonwealth of Pennsylvania, Don Jose Stovall, Individually and as Executive Director of the Philadelphia County Board of Assistance, Helen Hyde, Individually and as Director of Operations, Philadelphia County Board of Assistance, June Reed, Individually and as District Supervisor, Medical Assistance District Office, Philadelphia County Board of Assistance, Cynthia Anderson, Individually and as Assistant District Supervisor, Medical Assistance District Office, Philadelphia County Board of Assistance, Mildred Davis, Individually and as Assistant District Supervisor, Medical Assistance District Office, Philadelphia County Board of Assistance, and Aurelius Robertson, Individually and as Casework Supervisor, Medical Assistance District Office, Philadelphia County Board of Assistance, William Harden, John Grady, Appellants.

No. 81–2734.

United States Court of Appeals, Third Circuit.

Argued May 13, 1982.

Decided July 20, 1982.

As Amended Aug. 4, 1982.

Certiorari Denied Nov. 1, 1982.

See 103 S.Ct. 300.

John O. J. Shellenberger, Deputy Atty. Gen., Philadelphia, Pa. (argued), for appellants.

Jerome J. Shestack (argued), Bernard G. Segal, Joseph C. Crawford, Nicholas J. LePore, III, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., for appellees.

Before GIBBONS and HUNTER, Circuit Judges and GERRY,* District Judge.

## OPINION OF THE COURT

JAMES HUNTER, III, Circuit Judge.

This appeal raises the question of whether certain provisions of two contracts between the ·Pennsylvania Department of Public Welfare ("PDPW") and the Pennsylvania Legal Services Center ("PLSC") and between PLSC and Community Legal Services ("CLS"), which prohibit CLS from requesting or accepting attorneys' fees in suits against the Commonwealth of Penn-

sylvania or Commonwealth employees, are void as contrary to public policy. Having been successful in their case-in-chief,[1] plaintiffs moved for an award of attorneys' fees to their counsel, CLS, pursuant to the Civil Rights Attorney Fees Awards Act, 42 U.S.C. § 1988 ("the Fees Awards Act").[2] Appendix at 64a. An award was granted by Memorandum and Order of the district court on August 17, 1981 in favor of CLS. Appendix at 330a. The court held that the relevant contractual provisions between CLS and the Commonwealth were void because they conflicted with the public policy underlying by the Fees Awards Act.[3] We agree and will affirm the order of the district court.

## FACTS AND PROCEDURAL HISTORY

CLS is a non-profit legal services corporation the sole purpose of which is to provide legal services to the poor. It receives approximately half of its operating budget directly from the federal Legal Services Corporation under the Legal Services Corporation Act, 42 U.S.C. § 2996, et seq. The remaining half is received under Title XX of the Social Security Act, 42 U.S.C. § 1397, et seq. Appendix at 107a–108a. Title XX funding is channelled from the United States Department of Health and Human Services to DPW. DPW then allocates a portion of the federal funds, together with a 25% matching state grant, to various community based legal services programs, including CLS. Appendix at 108a. The actual distribution and administration of Title

---

* Honorable John F. Gerry, United States District Judge for the District of New Jersey, sitting by designation.

1. Plaintiffs brought suit against the Commonwealth under the 1871 Civil Rights Act, 42 U.S.C. § 1983. The litigation was commenced in 1975 as a class action by medically needy individuals who alleged an unlawful deprivation of certain medical benefits. Specifically, they requested injunctive and monetary relief because of: (1) violations of due process by the individual appellants in terminating Medicaid benefits without prior notice or opportunity for a hearing; and (2) operation of the Medicaid program under illegally low eligibility requirements. The plaintiffs essentially prevailed and a Stipulation of Settlement was executed on October 16, 1979. Appendix at 35a. This was

approved by Order of the District Court on December 28, 1979. Appendix at 49a.

2. Section 1988 provides in pertinent part:

In any action or proceeding to enforce a provision of sections 1981, 1982, 1983, 1985 and 1986 of this title, Title IX of Public Law 92–318, or Title VI of the Civil Rights Act of 1964, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs. ·

3. The parties had agreed that if attorney's fees were permitted, a reasonable amount was $85,000. Appendix at 350a. Accordingly, judgment was entered in that amount by Order of September 9, 1981. Appendix at 349a.

XX monies for legal services is performed by the conduit organization, PLSC.

Pursuant to this funding arrangement, CLS entered into a series of annual contracts with PLSC for the fiscal years 1978–1981, during which CLS performed much of the work in the preparation of this case. The contracts for the fiscal periods 1979–1980 and 1980–1981 contained the provisions which prevent CLS from requesting attorneys' fees arising out of litigation against the Commonwealth or Commonwealth employees.[4]

Before the no fees clause was inserted into the PLSC–CLS contract, DPW used other arguments in attempts to prevent CLS from obtaining fees when CLS attorneys successfully sued the Commonwealth. Beginning with fiscal year 1978–1979, DPW required, over the objections of PLSC and CLS, that DPW–PLSC funding contracts contain a no fees provision restricting the right of PLSC to receive attorneys' fees in cases against the Commonwealth. Since 1979, DPW has compelled PLSC to include a similar provision in its funding agreements with local legal services programs, including CLS. Appendix at 110a–111a.

The 1978–1979 contract between PLSC and DPW contained such a no fees provision. Although the 1978–1979 contract between PLSC and CLS did not contain a provision restricting the right to receive attorney's fees, the Commonwealth asserted the no fees provision of the PLSC/DPW contract as a defense to CLS's request for attorney's fees in *Bolden v. Pennsylvania State Police*, 491 F.Supp. 958, 959 (E.D.Pa. 1980). The district court in that case held that the putative restriction was not effective because it lacked the approval and ratification of the PLSC Board of Directors. The Commonwealth did not appeal that ruling.

However, the Commonwealth again instituted no fees restraints. In August 1979, PLSC proposed a contract to CLS for the fiscal year 1979–80 which contained a no fees provision. Appendix at 113a. CLS signed and returned the proposed contract on January 11, 1980 with a letter objecting to the provision. Appendix at 147a.[5]

In 1980 DPW again stated that no funding would be forthcoming for any legal services program which did not acquiesce in DPW's demands by signing a contract containing the no fees provision. Appendix at 117a.

Shortly before the end of the fiscal year, DPW and PLSC entered into a contract for

---

4. Specifically, the PLSC–CLS contract for the period October 1, 1979 to June 30, 1980 provided:

> The Department of Public Welfare requires inclusion of the following provision. Its inclusion and terms are subject to possible change, revision or other modification on the basis of objections by the Corporation:
>
> The [Legal Services Programs] and the Corporation shall not request attorneys' fees in any case brought against the Commonwealth or Commonwealth employees. In the event that any such attorneys' fees are awarded to the Corporation or LSPs, DPW will deduct the amount of fees so awarded from payment on the next invoice submitted by the Corporation. This provision is not applicable to costs imposed pursuant to Rule 37(e) of the Federal Rules of Civil Procedure.

Appendix at 123a.

The subsequent contract for the period ending June 30, 1981 also provided:

> The [Legal Services Programs] may not accept attorneys' fees in any cases brought against the Commonwealth or Commonwealth employees. This provision is not ap-

plicable to costs imposed pursuant to Rule 37(e) of the Federal Rules of Civil Procedure. Appendix at 156a.

5. CLS' letter acknowledged that the question of the no fees restriction was *sub judice* and that its obligations under that provision were conditional on the court in *Bolden* holding CLS to be bound by the similar provision under challenge in that case. The fees issue also arose in *Vecchione v. Wohlgemuth*, 481 F.Supp. 776 (E.D. Pa.1979) where CLS had been awarded attorneys' fees and costs against the Commonwealth. The Commonwealth paid CLS the *Vecchione* award in February, 1979. However, the Commonwealth attempted to subsequently reduce PLSC's statewide reimbursement by an equal amount. PLSC then had to reduce CLS' reimbursement by an approximately equal amount. When CLS instituted contempt proceedings against the Commonwealth before then District Judge Becker, the Commonwealth agreed to a Consent Order in which CLS would receive the fee award without suffering a like reduction in its reimbursements.

fiscal year 1980–1981, which again contained a no fees restraint. On June 30, 1980, CLS received from PLSC the proposed 1980–1981 contract, with a demand that the document be executed and returned no later than the following week. Appendix at 118a. On July 7, 1980, CLS officers, faced with many obligations to poor clients and a severe fiscal crisis, executed and returned the 1980–1981 contract to PLSC. Again, CLS attached a letter asserting that CLS did not, by executing the contract, waive its right to challenge the legality and enforceability of the no fees provision.[6] Appendix at 118a. CLS thus challenged the no fees provision in this case and its position was upheld by the district court. The Commonwealth has appealed.

## DISCUSSION

█ The threshold question in deciding this appeal is whether the district court properly concluded that this case presents a question of federal law, and not one of Pennsylvania of contract law. The district court was clearly correct. The underlying claim in this case is not based on contracts, but is a federal civil rights claim. Part of this claim is a request for attorneys' fees, made under a federal statute, to which a contract provision is raised as a defense. Therefore, the district court was correct in concluding that it is to federal law that it should turn for its rules of decision.[7]

Appellants argue that this court's decision in *Westmoreland Hospital Ass'n v. Blue Cross, et al*, 605 F.2d 119, 123 (3d Cir.1979), *cert. denied*, 444 U.S. 1077, 100 S.Ct. 1025, 62 L.Ed.2d 759 (1980), supports the proposition that the rules of Pennsylvania contract law control this case. We disagree. In *Westmoreland*, we held that certain insurance contract provisions deducting federal mental health staff grants from computation of hospitals' costs of operation were not void as contrary to public policy. The underlying claim in *Westmoreland* was based on contract and not, as here, on a federal statute. Furthermore, the district court in *Westmoreland* found no public policy that was contradictory to the contract provisions in question, and we agreed. 605 F.2d at 125. Because there was no conflict between the contracts and the alleged public policy, there was no controversy to resolve. Thus, we are not restrained by *Westmoreland*. The case before us is clearly at its roots a federal claim. Therefore, we now turn to the question of whether the contract provisions in question conflict with public policy.

*Public Policy Underlying the Fees Awards Act*

Having decided that federal law is controlling in this case, the district court held that the no fees restraints of the contracts between PLSC and CLS were unenforceable because they counteracted the federal public policy underlying the Fees Awards Act. The court utilized the analysis of the Restatement (Second) of Contracts § 178

---

6. Because we decide this case on the public policy issue, we need not address the appellees' contention that the 1980–81 contract was voidable as the product of economic duress. However, for the sake of factual completeness it is important to stress that DPW had insisted that it would not provide any 1980–81 funding for any social program which had not signed a contract which conformed to DPW demands (including the no fees provision). Appendix at 117a. On June 26, 1980, CLS unexpectedly suffered a $118,000 reduction in its Title XX reimbursements for expenses incurred during April and May of that year. Appendix at 116a. In June 1980, CLS was facing its second successive annual funding cut by the Commonwealth which had already resulted in service reductions and a 20% decrease in attorney staff. Appendix at 115a.

7. Of course, as the district court noted, the Pennsylvania law of illegal contracts may be instructive. Indeed, in Pennsylvania, as in almost all Anglo-American jurisdictions, contracts that are contrary to public policy, those which tend to be injurious to the public good, are illegal and void. In *Book's Estate*, 297 Pa. 543, 147 A. 608, 609 (Pa.1929), the Supreme Court of Pennsylvania held that a contract is against public policy if it has "a tendency to injure the public or to be against the public good, or [is] inconsistent with good morals as to the consideration or the thing to be done." *See generally* 8 *Pennsylvania Law Encyclopedia*, § 103.

(1981).[8] After considering and balancing the factors in favor of enforcement of the contracts against the public policies weighing against enforcement, the court denied effect to the no fees provisions. The district court's conclusion and its approach were correct.

Congress enacted the Fees Awards Act to encourage private citizens to enforce fundamental rights under the civil rights laws.[9] Quite simply, the policy behind the Act is to encourage compliance with and enforcement of those laws. *Maher v. Gagne*, 448 U.S. 122, 100 S.Ct. 2570, 65 L.Ed.2d 653 (1980); *Maine v. Thiboutot*, 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980); *Ross v. Horn*, 598 F.2d 1312 (3d Cir. 1979); *cert. denied*, 448 U.S. 906, 100 S.Ct. 3048, 65 L.Ed.2d 1136; *Skehan v. Bd. of Trustees*, 590 F.2d 470 (3d Cir. 1978), *cert. denied*, 444 U.S. 832, 100 S.Ct. 61, 62 L.Ed.2d 41 (1979). *See also*, S.Rep.No.94–1011, 94th Cong., 2d Sess. 2, *reprinted in* [1976] U.S.Code Cong. & Admin.News, pp. 5908, 5910. Congress has noted that the primary goal of the Act is "to promote the enforcement of the Federal Civil Rights Acts, as Congress intended, and to achieve uniformity in those statutes and justice for all citizens." H.R.Rep. No.94–1558, 94th Cong., 2d Sess. 1, 19 (1976). *See Rodriguez v. Taylor*, 569 F.2d 1231, 1245 (3d Cir.1977), *cert. denied*, 436 U.S. 913, 98 S.Ct. 2254, 56 L.Ed.2d 414 (1978). Courts have stated that the Act must be liberally construed to achieve these ends. *Mid-Hudson Legal Service, Inc. v. G. & U., Inc.*, 578 F.2d 34, 37 (2d Cir. 1978); *Dennis v. Chang*, 611 F.2d 1302, 1306 (9th Cir. 1980).

The district court in this case outlined clearly its view of the public policy involved:

The public policy embodied in Section 1988 is a vital one. Congress could not have been clearer in its intent or in the seriousness it attached to the attorneys' fees provisions. The use of words such as 'essential' and 'integral' is prevalent in the legislative history and in the cases construing the Act. The policy is, quite clearly, an important one.

520 F.Supp. at 864. The court was referring, among other things, to the Senate Report's unambiguous statement of the policy behind the Act:

Fee awards are an integral part of the remedies necessary to obtain such compliance [with the civil rights laws] ... If our civil rights laws are not to become mere hollow pronouncements which the average citizen cannot enforce, we must

**8.** The district court opinion cites § 320 of the Restatement (Second) of Contracts (Tent. Draft No. 12, 1977). The tentative draft relied upon by the district court has now been officially adopted and promulgated by the American Law Institute in § 178.

**9.** The Fees Awards Act was passed in reaction to the Supreme Court's decision in *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). In that case the Supreme Court reversed a decision of the lower court awarding counsel fees to the plaintiffs on a "private attorney general" theory. The Court noted that "it would be inappropriate for the Judiciary, without legislative guidance, to reallocate the burdens of litigation." 421 U.S. at 240, 95 S.Ct. at 1612. The "private attorney general theory" was explicitly endorsed by the legislature in enacting the Fees Awards Act. *See* S.Rep.No. 94–1011, 94th Cong., 2d Sess. 2, *reprinted in* [1976] U.S.Code Cong. & Admin.News, pp. 5908, 5910. The statute provided the bar with a greater incentive to pursue claims and was especially aimed at encouraging litigation in areas where only non-pecuniary relief was available. *See e.g.*, 122 Cong.Rec. 33,314 (1976) (remarks of Sen. Kennedy):

[T]here is [sic] often important principles to be gained in [civil rights] litigation, and rights to be conferred or enforced, but just as often no large promise of monetary recovery lies at the end of the tunnel. So civil rights cases—unlike tort or antitrust cases—do not provide the prevailing plaintiffs with a large recovery from which he can pay his lawyer.

*See generally*, Note, "Awards of Attorney's Fees to Legal Aid Offices," 87 *Harv.L.Rev.* 411 (1973); Malson, "In Response to Alyeska—The Civil Rights Attorney's Fees Awards Act of 1976," 21 *St. Louis U.L.J.* 430 (1976); Comment, "Attorney's Fees in Damage Actions Under the Civil Rights Attorney's Fees Awards Act of 1976," 47 *U.Chi.L.Rev.* 332 (1980); Note, "Promoting the Vindication of Civil Rights Through the Attorney's Fees Awards Act, 89 *Col.L.Rev.* 346 (1980).

maintain the traditionally effective remedy of fee shifting in these cases.

S.Rep.No.94–1011 at 5913 (emphasis added).

An important aspect of the enforcement scheme designed by Congress is the collection of attorneys' fees from the states when states are losing defendants. It is clear that Congress contemplated that states and state officials would often be the targets of civil rights actions:

> [D]efendants in these [civil rights] cases are often state or local bodies of state or local officials. In such cases, it is intended that attorneys' fees, like other items of costs, will be collected either directly from the official, in his official capacity, from funds of his agency or under his control, or from the state or local government (whether or not the agency or government is a named party).

S.R.No.94–1011, *supra*, at 5913 (footnotes omitted).

In *Hutto v. Finney*, 437 U.S. 678, 694, 98 S.Ct. 2565, 2575, 57 L.Ed.2d 522 (1978), the Supreme Court held that the Eleventh Amendment did not bar an award of attorneys' fees against a state. The Court noted:

> The [Awards] Act itself could not be broader. It applies to 'any' action brought to enforce certain civil rights laws. It contains no hint of an exception for States defending injunctive actions, indeed, the Act primarily applies to laws passed specifically to restrain state action. *See, e.g.,* 42 U.S.C. § 1983.... The House Report is in accord: 'The greater resources available to governments provide an ample base from which fees can be awarded to the prevailing plaintiff in suits against governmental officials or entities.' H.R.Rep.No.94–1558, p. 7 (1976).

437 U.S. at 694, 98 S.Ct. at 2575.

■ It is well settled that Congress intended legal service programs, like private attorneys, to receive fees under the Fees Awards Act. Courts have awarded attorney's fees without regard to plaintiffs' ability to pay for counsel or the availability of free legal counsel. *Riddell v. National Democratic Party*, 624 F.2d 539, 543 (5th

Cir. 1980). In *Rodriguez v. Taylor*, 569 F.2d 1231, 1245 (3d Cir. 1977), we stated:

> The statutory policies underlying the award of fees justify such shifting without regard to whether the individual plaintiff initially assumed the financial burdens of representation.... The award of fees to legal aid offices and other groups furnishing *pro bono publico* representation promotes the enforcement of the underlying statutes as much as an award to privately retained counsel. Legal services organizations often must ration their limited financial and manpower resources. Allowing them to recover fees enhances their capabilities to assist in the enforcement of congressionally favored individual rights. (citations omitted.)

In *Dennis v. Chang*, the Ninth Circuit agreed that:

> [a]n award [where plaintiff has been represented without charge by a legal service organization] serves the purposes of the [Fees Awards] Act for two reasons: (1) the award encourages the legal services organization to expend its limited resources in litigation aimed at enforcing the civil rights statutes; and (2) the award encourages potential defendants to comply with civil rights statutes.

611 F.2d at 1306.

Thus, Legal Aid offices serve a private enforcement role and further the policies contemplated by Congress in the Fees Awards Act. In *Rodriguez*, we discussed this role in more detail:

> ... legal services organizations may win only modest cash awards or nonmonetized equitable relief for their clients. Despite the often insignificant potential monetary benefits in individual cases, legal services organizations render valuable services to their clients and their communities. *Legal aid organizations are often the sole representatives of the economically, socially and culturally deprived in their disputes with landlords, government welfare agencies, employers and creditors.*

569 F.2d at 1248 (emphasis added).

Fee incentives to legal aid offices are essential to enable legal services organiza-

tions to provide more than individual, routine legal services for poor litigants. To a great extent, legal services organizations must allocate limited resources among various possible clients.[10] Of necessity, the potential for fee recovery will be one of the factors considered in the allocation and use of resources for the maximum benefit of the poor. We are not persuaded by the Commonwealth's contention that the contractual extraction of the financial incentives created by the Fees Awards Act will have no effect on CLS because it is "not free to pick its suits on the basis of pecuniary concerns." Appellants' Brief at 18.

▇ Prior to the Supreme Court's decision in *Alyeska Pipeline*, federal courts had awarded attorneys' fees as an exercise of their traditional equitable powers. *See Hall v. Cole*, 412 U.S. 1, 4–5, 93 S.Ct. 1943, 1945–46, 36 L.Ed.2d 702 (1973); *Mills v. Electric Auto Life Co.*, 396 U.S. 375, 392–93, 90 S.Ct. 616, 625–26, 24 L.Ed.2d 593 (1970). By enacting the Fees Awards Act, Congress reinvested the judiciary with the discretion to grant attorneys' fees in civil rights cases. In this case, we conclude that the Commonwealth has attempted to vitiate, by contract, a significant portion of the power and duty which Congress has granted to the judiciary as an essential tool in the scheme of civil rights enforcement. It is axiomatic to our federal system that neither private parties nor the states can avoid the equitable powers of the federal courts. *Dodge v. Tulleys*, 144 U.S. 451, 457, 12 S.Ct. 728, 730–31, 36 L.Ed. 501 (1882). Here, the existence of a contrary private agreement cannot successfully be asserted as a defense to the district court's statutorily mandated supervisory power over attorneys' fees.

If the Commonwealth could insert and enforce the no fees restraints in its contracts, the policy of economic inducement sought by Congress would be severely impaired. Legal service programs for the poor would have both less incentive and ability to bring civil rights suits against the Commonwealth. Thus, one of the most important types of private attorneys general would be significantly less willing to pursue civil rights litigation against the state. Judge Newcomer stated the issue aptly:

> Like any private lawyer, CLS must remain within a budget, and only do the legal work that it can afford to do. What the Commonwealth has attempted to do here is to buy immunity from CLS lawyers. In return for a steady partial subsidy, the Commonwealth has demanded that CLS not seek attorneys' fees in cases brought against the Commonwealth. *The obvious effect of this, if the agreement is enforced, is to cause CLS not to bring actions against the Commonwealth.* In end result, an important member of the plaintiffs' civil rights bar would be removed from the scene, and the vigorous enforcement of the laws would be materially quelled.

520 F.Supp. at 864 (emphasis added; footnotes and citations omitted). Congress expressed unambiguously the significance it attached to the attorneys' fees provisions, and we conclude that the public policy embodied in § 1988 is a vital one.[11]

---

10. Commentators agree:

> Since the overburdened legal aid office cannot expand as the workload increases, given the level of its resources, and since pursuing a particular case in depth involves cutting back on time spent elsewhere, legal aid lawyers must continually balance costs and benefits of various time allocations... A possible award of attorney's fees may cause the legal aid office to change its allocation of services to some extent, and the funds derived from such awards may secure adequate representation for the office's other clients seeking relief under the same statute.

Note, Awards of Attorney's Fees to Legal Aid Offices, 87 *Har.L.Rev.* 411, 414 (1973).

11. The importance of attorneys' fees in civil rights cases is also evidenced by the special standard to be used by district courts in deciding whether to grant such fees. Although it will be in the district court's discretion to decide whether a plaintiff is entitled to attorneys' fees under § 1988:

> [a] party seeking to enforce the rights protected by the statutes covered by (§ 1988), if successful, should ordinarily recover attorneys' fees unless special circumstances would render such an award unjust.

*Staten v. Housing Authority of Pittsburgh*, 3rd Cir. 638 F.2d 599, 604 (3d Cir. 1980), *citing Skehan v. Bd. of Trustees*, 590 F.2d 470, 496 (3d Cir. 1978), *cert. denied*, 444 U.S. 832, 100

### Public Policy in Favor of Enforcement

Appellants advance several arguments regarding public policy considerations in favor of enforcement of the contract provision which they contend outweigh the considerations outlined above. Although appellants' arguments have some merit, they do not outweigh the public policy embodied in the Fees Awards Act.

First, the Commonwealth argues that there is a public benefit in funding legal services programs with a fixed and known budget. This is true; but it misses the mark. Attorneys' fees awards to prevailing parties in civil rights litigation are not *part* of public funding to legal services programs. They are distinct payments of the cost of litigation in accordance with rights and responsibilities determined by Congress. The Commonwealth would have had the burden of paying fees under the Act for violations of civil rights had the litigants' counsel been private. The fact that the taxpayer may be the ultimate payor is not a reason for supporting the no fees restraints. *See Riddel v. National Democratic Party,* 624 F.2d at 545. In any event, it is equally plausible to argue that the taxpayer ultimately gains from the payment of attorneys' fees because civil rights litigation is generally recognized as benefiting the public as a whole.[12]

Along similar lines, the Commonwealth argues that its funding of legal service programs is an effective substitute for the provisions of the Fees Awards Act. The Commonwealth contends that the state's funding scheme promotes civil rights litigation "more effectively than does the statute ... [thereby rendering it] all but superfluous." Appellants' Brief at 16–17.

Obviously funding of a legal services provision by the state furthers the goal of representation of the indigent. However, that basic level of funding provided in the annual grant is not enough to provide incentives to undertake representation in the specific types of civil rights litigation which Congress hoped to encourage. The case at bar is a prime example of the kind of litigation that Congress intended to encourage through the Fees Awards Act. Here, the district court granted injunctive and declaratory relief to two plaintiff classes. The classes comprised, in the first class, recipients of and, in the second class, applicants for, medical assistance to the medically needy. The first class succeeded in proving that the state program conflicted with federal regulations. The second class succeeded in showing that medical assistance benefits had been unconstitutionally terminated. *Shadis, et al. v. Beal, et al.,* Civil Action No. 75–3421 (E.D.Pa. August 10, 1976) (order granting declaratory and injunctive relief on liability issues.) The Commonwealth's argument that its grant to CLS of the minimum amount of money required of it in order to obtain federal funding benefits the poor more than the potential of attorneys' fees awards is disingenuous. The case at bar proves the contrary. Advanced funding does not serve as an inducement to the State to comply with civil rights laws. The prospect of having to pay attorneys' fees does provide such an incentive. Indeed, the state may also have an incentive to settle a case early. *See Dennis v. Chang,* 611 F.2d at 1307.

The Commonwealth slightly rephrases the contention by arguing that it does not want to "pay legal fees twice."

S.Ct. 61, 62 L.Ed.2d 41 (1979), *citing* S.Rep.No. 94–1011, 94th Cong. 2d Sess. 4, *reprinted in* (1976) U.S.Code Cong. & Admin.News, pp. 5908, 5912 (emphasis added). *See also Ross v. Horn,* 598 F.2d 1312 (3d Cir. 1979), *cert. denied,* 448 U.S. 906, 100 S.Ct. 3048, 65 L.Ed.2d 1136 (1980); *Sethy v. Alameda County Water District,* 602 F.2d 894 (9th Cir. 1979), *cert. denied,* 444 U.S. 1046, 100 S.Ct. 734, 62 L.Ed.2d 731 (1980); *Dawson v. Pastrick,* 600 F.2d 70 (7th Cir. 1979); *Bonnes v. Long,* 599 F.2d 1316 (4th

Cir.1979); *Mid-Hudson Legal Services, Inc. v. G & U, Inc.,* 578 F.2d 34 (2nd Cir. 1978); *Brown v. Culpepper,* 559 F.2d 274 (5th Cir. 1977).

12. Indeed, one of the Congressional purposes supporting the fee-shifting provisions of the Fees Awards Act was to *save* taxpayers' funds by utilizing private attorney generals as a means of "limiting the growth of the enforcement bureaucracy." *See* S.Rep.No.94–1011 at 5911.

Appellants' Brief at 17. This rhetorical ploy avoids the issue. The Commonwealth does not pay "twice" when it violates someone's civil rights and is then forced to pay attorneys' fees. It pays only once—as a violater of civil rights. Its role as a provider of public services is distinct from its role as a defendant in a civil rights case and has no bearing on the question of reimbursing individual citizens for individual wrong brought upon them.[13]

*Use of the Restatement of Contracts Standard*

■ In balancing the policy considerations in connection with the contractual fee restraints, the district court used the approach presented in Sections 178 and 179 of the *Restatement (Second) of Contracts* (1979). Section 178 provides:

(1) A promise or other term of an agreement is unenforceable on grounds of public policy if legislation provides that it is unenforceable or the interest in its enforcement is clearly outweighted in the circumstances by a public policy against enforcement of such terms.[14]

The Commonwealth argues that the district court's application of the Restatement's formulation was incorrect because it failed to require that the legislation in question either "expressly prohibit[s] the contract or . . . require[s] a performance or a result that directly contradicts what the contract requires." Appellants' Brief at 10–11. Neither federal nor Pennsylvania law requires such a direct, explicit conflict. Such a requirement would require that a contract be "illegal" in a literal sense before it could be invalid. However, the scope of the public policy doctrine is broader and more encompassing than the concept of illegality.[15]

Section 179 of the Restatement provides that public policy against "the enforcement of promises or other terms may be derived by the court from: "(a) legislation relevant to such a policy, or (b) the need to protect some aspect of the public welfare . . ." The Restatement obviously does not require that the legislation in question expressly prohibit or require an act inconsistent with the contract; it is sufficient if the legislature makes an adequate declaration of public policy which is inconsistent with the

13. The Ninth Circuit rejected an argument similar to the Commonwealth's in *Dennis v. Chang*:

The remaining argument is that 'double payment' is somehow 'unfair.' Since awards of attorneys' fees to state funded legal services organizations in civil rights litigation against the state are encompassed within the statutory language of the Fees Awards Act, were in all probability contemplated by Congress, and serve the purpose for which the Act was adopted, the question of fairness has been resolved by Congress.

611 F.2d at 1307.

14. Section 178 continues:

(2) In weighing the interest in the enforcement of a term, account is taken of
(a) the parties' justified expectations;
(b) any forfeiture that would result if enforcement were denied; and
(c) any special public interest in the enforcement of a particular term.
(3) In weighing a public policy against enforcement of a term, account is taken of
(a) the strength of that policy as manifested by legislation or judicial decisions;
(b) the likelihood that a refusal to enforce the term will further that policy;

(c) the seriousness of any misconduct involved and the extent to which it was deliberate; and
(d) the directness of the connection between that misconduct and the term.

15. The decisional law of Pennsylvania is consistent with this position. In *Central Dauphin School District v. American Casualty Co.*, 493 Pa. 254, 426 A.2d 94 (1981), the Supreme Court of Pennsylvania endorsed the approach of the Restatement (Second) of Contracts. Many years prior to *Central Dauphin* that same court stated that a contract which is injurious to the public interest may be held void even in the absence of express legislative mandates contrary to the provisions of the agreement. *Kuhn v. Buhl*, 251 Pa. 348, 370, 96 A. 977 (1916). Sections 178 and 179 represent an accurate reflection of the law regarding the public policy contractual defense. *See, e.g., Jackson Purchase Rural Electric Cooperative Association v. Local Union 816, IBEW*, 646 F.2d 264 (6th Cir. 1981); *California Pacific Bank v. Small Business Administration*, 557 F.2d 218 (9th Cir. 1977).

contract's terms. For example, the Restatement notes:

> The legislation is significant, not as controlling the disposition of the case, but as enlightening the court concerning some specific policy to which it is relevant. A court will examine the particular statute in the light of the whole legislative scheme.... It will look to the purpose and history of the statute.

Comment (b) to Section 179. *See generally* 6A A. Corbin *Corbin on Contracts* § 1375 (1962).

The Commonwealth primarily relied on *Westmoreland Hospital*, in which we held that certain cost-reimbursement contracts were not illegal or contrary to public policy. However, as noted *supra*, this court's holding in that case was predicated in part on the absence of a contrary public policy in the relevant legislation and administrative regulations. 605 F.2d at 125. Here, there is such a contrary public policy, the impact of which the state has attempted to avoid.

### CONCLUSION

For the foregoing reasons, we rule that the no fees provisions of the contracts between CLS and PLSC are void as contrary to public policy. The judgment of the district court will be affirmed.