**Dorothy GAUTREAUX, et al.,
Plaintiffs-Appellees,**

v.

**The CHICAGO HOUSING AUTHORITY,
Defendant-Appellant.**

**No. 81–2223.**

United States Court of Appeals,
Seventh Circuit.

Argued May 10, 1982.

Decided Aug. 30, 1982.

Rehearing and Rehearing En Banc
Denied Nov. 1, 1982.

**602**

Patrick W. O'Brien, Mayer, Brown & Platt, Chicago, Ill., for defendant-appellant.

Robert J. Vollen, Business & Professional People for the Public Interest, Chicago, Ill., for plaintiffs-appellees.

Before CUMMINGS, Chief Judge, DAVIS, Associate Judge,* and PELL, Circuit Judge.

---

* The Honorable Oscar H. Davis, Associate Judge of the United States Court of Claims, is sitting by designation.

CUMMINGS, Chief Judge.

This appeal is a byproduct of the celebrated *Gautreaux* case, whose complexities and history are summarized in *Gautreaux v. Landrieu*, 523 F.Supp. 665, 667–669 (N.D.Ill. 1981). The issue here is relatively narrow: the propriety of an interim award of attorney's fees under 42 U.S.C. § 1988 to Alexander Polikoff as the representative of counsel for the plaintiff class.[1] District Judge Crowley ordered the Chicago Housing Authority (CHA) to pay $375,375 for more than 3,000 hours of work between 1965 and 1980.[2] *Gautreaux v. Landrieu*, 523 F.Supp. 684 (N.D.Ill.1981). On appeal CHA argues that Judge Crowley erred because

(1) the suit against CHA (*i.e.*, 66–C–1459)[3] was not "pending" on October 19, 1976, when the Civil Rights Attorney's Fees Awards Act of 1976 (codified at 42 U.S.C. § 1988) became effective, and therefore no fees are awardable under the statute although plaintiffs have prevailed in the litigation as a whole;

(2) if any aspects of the suit could be considered pending on October 19, 1976, they were only supplemental enforcement proceedings in which the plaintiffs did not prevail as Section 1988 requires;

(3) the petition for fees was not timely filed; and

(4) the award of fees at a rate of $125 per hour for 3,003 hours was an abuse of discretion.

Finding all these arguments unpersuasive, we affirm the district court's fee award.

## I

The most substantial issue CHA presents is whether the *Gautreaux* litigation was pending on October 19, 1976.[4] Congress enacted the Fees Awards Act in 1976 in response to the Supreme Court's decision in *Alyeska Pipeline Co. v. Wilderness Society*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (courts are not free to award attorney's fees to parties serving as "private attorneys general" absent specific legislative authorization). The Act provides that "[i]n any action or proceeding to enforce a provision of sections 1981, 1982, 1983, 1985, and 1986 of this title, title IX of Public Law 92–318, or title VI of the Civil Rights Act of 1964, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs." Although the statute is silent on the point, the legislative history makes clear that Congress intended Section 1988

---

**1.** The fees are to be paid directly to the Illinois Division of the American Civil Liberties Union (ACLU, for whom Mr. Polikoff acted as volunteer lead counsel in *Gautreaux* until 1970) and to Business and Professional People for the Public Interest (BPI, which Mr. Polikoff has headed since 1970 and which has staffed the *Gautreaux* case with volunteer lawyers from 1970 to the present). 523 F.Supp. at 691; Polikoff affidavit, CHA App. 2. None of the other attorneys who have worked on the case, either for the ACLU or for BPI, makes any claim to fees for services rendered. 523 F.Supp. at 685; Polikoff affidavit, CHA App. 7.

**2.** Although the Department of Housing and Urban Development (HUD) joined the CHA in opposing some aspects of the fee award in the district court, it is not a party to this appeal. Fees under Section 1988 are not available against HUD, *Shannon v. Dept. of Housing and Urban Dev.*, 577 F.2d 854, 856 (3d Cir. 1978), certiorari denied, 439 U.S. 1002, 99 S.Ct. 611, 58 L.Ed.2d 677; but the fees awarded by Judge Crowley do not require CHA to pay more than

its share. The Polikoff affidavit (CHA App. 5–6) excludes time that would be allocable to HUD, as well as time spent on litigation with other parties and on unsuccessful aspects of plaintiffs' case.

**3.** 66–C–1459 and 66–C–1460 (the case against HUD) were consolidated in 1971 (R. 100 of docket sheets for 66–C–1460). The consolidation was in response to our decision in *Gautreaux v. Romney*, 448 F.2d 731 (7th Cir. 1971), that HUD was as culpable as CHA in perpetuating segregated low-income housing in Chicago. CHA suggests that the consolidation has contributed to an erroneous finding that fees were awardable here (Reply Br. 7); our discussion of that argument is found at pp. 605–607, *infra*.

**4.** In view of our resolution of this question (argument (1) *supra*), we need not address argument (2) above, that only supplemental proceedings took place after 1976 and that plaintiffs did not prevail in them.

as amended to "apply to all cases pending on the date of enactment [October 19, 1976] as well as all future cases, *Bradley v. Richmond School Board,* 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974)." H.R.Rep.No. 94–1558, 94th Cong., 2d Sess. 4, n. 6.[5]

The issue posed in this appeal is how that legislative direction is to be applied to equitable proceedings that have lasted sixteen years and are not yet concluded. Put differently, the question is whether the test that has developed for determining pendency is to be applied in a technical or a common-sense fashion.

■ In the formulation of the test on which the parties and the district judge focused, a case is pending if there is an "active" issue that has not been finally resolved at the critical time. An "active" issue is defined—by a process of inclusion and exclusion—as

a substantive claim upon which a district court has not acted, either in the first instance or on remand, or a substantive claim whose disposition by the district court, or the Court of Appeals, either is on appeal or is appealable. The mere pendency on the date of enactment of an attorney fees act of *supplemental* proceedings to effectuate a prior final judgment is not, in our opinion, sufficient to convert an action into such a "pending

action" as to warrant an award of attorney's fees under such an act pursuant to the *Bradley*-type retroactive application of the act.

*Peacock v. Drew Municipal Separate School Dist.,* 433 F.Supp. 1072, 1075 (N.D.Miss. 1977) (emphasis added), affirmed on basis of district court opinion, 611 F.2d 1160 (5th Cir. 1980) (*per curiam*).

CHA takes a literal view of the test. The district court had found in 1969 that CHA engaged in intentional racial discrimination in its low-income housing program, 296 F.Supp. 907 (N.D.Ill.1969). The court had entered a remedial order shortly thereafter, 304 F.Supp. 736 (N.D.Ill.1969). CHA had taken no appeal from either decision. Therefore, it argues, all subsequent proceedings (whether they generated appeals or not) were efforts to effectuate the 1969 judgment and hence "supplemental." [6] (Br. 17–29.) The district judge, by contrast, took a common-sense approach. He viewed the district court's broad retention of jurisdiction[7] and its frequent modifications of the 1969 injunction[8] as evidence that "continuing judicial proceedings that would involve active controversy were expressly contemplated." 523 F.Supp. at 689. Looking at the entire course of the litigation, he found no justification for treating the 1969 order, though it was admittedly final in the

---

5. In incorporating *Bradley,* Congress must be deemed to adopt its analysis. The salient features of *Bradley* are that a court is to apply the law in effect at the time of its decision, unless it would be clearly unjust to do so or there is legislative direction to the contrary; and that it is not clearly unjust to give a fee statute retrospective effect where the parties have disparate abilities to protect themselves, where a public right is vindicated, and where the law does not change the substantive obligations of the parties.

6. The summary of the consolidated litigation at 523 F.Supp. 665, 666–668, lists eight published district court decisions, six Court of Appeals opinions, and one Supreme Court case. Four additional district court decisions and two further appeals postdate the summary. CHA would treat all but two of these as either supplemental or related solely to the HUD case.

7. Paragraph X of the order, 304 F.Supp. 736, 741, provides:

This Court retains jurisdiction of this matter for all purposes, including enforcement and the issuance, upon proper notice and motion, of orders modifying or supplementing the terms of this order upon the presentation of relevant information with respect to proposed developments designed by CHA alone or in combination with other private or public agencies to achieve results consistent with this order, material change in conditions existing at the time of this order, or any other matter.

The retained jurisdiction was promptly exercised as well. The initial order was supplemented on September 12, 1969; September 15, 1969; October 20, 1969; October 23, 1969; and November 24, 1969. See 436 F.2d 306, 308 (7th Cir. 1970).

8. We were informed at oral argument that the July 1969 injunction has been modified seventeen times to date—eight times before October of 1976 and nine times thereafter.

sense of "non-appealable," as so conclusive of the parties' dispute that the next twelve years of litigation could be called "supplemental proceedings to effectuate a prior final judgment." *Id.* at 688–689.

Like the district judge, we favor a common-sense approach. It is more consistent with the history of this particular lawsuit, with other cases in which the applicability of the Fees Awards Act has been an issue, and with the nature of equitable proceedings in general not to divide a continuously active equitable case into a host of separate smaller matters.

*Gautreaux Revisited*

We begin with a summary of how this litigation has gone, what CHA has been ordered to do, and what its track record for compliance is. The purpose of this summary is to demonstrate the artificiality of CHA's conceit that the case ended, for Section 1988 purposes, in 1969 and to refute an alternative CHA argument, namely, that only the companion case against the Department of Housing and Urban Development (HUD) was pending in 1976 and that "CHA's marginal participation in the case against HUD should [not] affect its liability for fees in the other case." Reply Br. 7.[9]

Judge Austin's original remedial order, 304 F.Supp. at 737–743, had two focuses: CHA was to modify its tenant assignment system, which had previously resulted in a high degree of racial segregation in existing housing. CHA was also to adopt new site selection and construction procedures to ensure that new housing was not concentrated in segregative patterns or built on a huge and dehumanizing scale. CHA points out that "the tenant assignment plan was never an issue after [1969]" (Br. 26), but it neglects to mention that progress on the site selection and construction aspect has been almost nonexistent.[10]

Historically, CHA's procedure for selecting housing sites was to submit proposals to the Chicago City Council. After the July

1969 order, it submitted no proposals, arguing that matters were best postponed until after the April 1971 mayoral elections. This Court affirmed Judge Austin's order directing CHA to submit proposals to the City Council by September 20, 1970. 436 F.2d 306 (7th Cir. 1970), certiorari denied, 402 U.S. 922, 91 S.Ct. 1378, 28 L.Ed.2d 661. Thereafter it was the City Council's turn to be recalcitrant. It conducted no hearings on the CHA submissions. Accordingly Judge Austin ordered CHA to bypass the City Council, even though Council approval was a procedural step required by Illinois statute. A divided panel of this Court affirmed, 480 F.2d 210 (7th Cir. 1973), certiorari denied, 414 U.S. 1144, 94 S.Ct. 895, 39 L.Ed.2d 98. In both of these appeals CHA conduct was directly in issue and CHA was an appellant in this Court.

After the consolidation of the CHA and HUD cases in 1971, CHA also found itself involved in the consolidated HUD case. It is disingenuous, however, to call CHA's participation "marginal" (CHA Reply Br. 7). For example, CHA intervened on appeal to challenge Judge Austin's decision to enjoin HUD from disbursing $26 million in Model Cities funding to Chicago. We reversed, 457 F.2d 124 (7th Cir. 1972), on the ground that there was an insufficient connection between the Model Cities Program and CHA's segregation of low-income housing. CHA was also a party to the appeal of Judge Austin's decision restricting the scope of HUD and CHA remedial activities to the city limits of Chicago—a decision we also reversed, 503 F.2d 930 (7th Cir. 1974), affirmed sub nom. *Hills v. Gautreaux,* 425 U.S. 284, 96 S.Ct. 1538, 47 L.Ed.2d 792. CHA's interest in both appeals is not hard to discern. It would be under increased pressure to comply with Judge Austin's orders if its failure to do so could jeopardize the City's receipt of other federal funds; and it wanted to be sure that if its site selection and construction program had to

---

**9.** See note 3 *supra.*

**10.** "[D]espite continuous litigation, numerous hearings and remedial court orders and referral

to a Special Master * * *, during the past twelve years, plaintiffs have yet to realize more than token relief." 523 F.Supp. at 667 (referring to the consolidated litigation).

be metropolitan in scope, HUD's resources would be committed on the same scale. CHA did not attempt to secure Supreme Court review of our decision about a metropolitan remedy. Only HUD was a petitioner in *Hills v. Gautreaux*, 425 U.S. 284, 96 S.Ct. 1538, 47 L.Ed.2d 792. But the Supreme Court's decision made clear that on remand CHA would be equally implicated in the metropolitan relief that the district judge could properly order: [11]

> Both CHA and HUD have the authority to operate outside the Chicago city limits. * * * [I]t is entirely appropriate and consistent with *Milliken* to order CHA and HUD to attempt to create housing alternatives for the respondents in the Chicago suburbs.

425 U.S. at 298–299, 96 S.Ct. at 1547 (footnote omitted).[12]

In short, after the Supreme Court's decision in April of 1976, the entire suit came back to the district court in a new posture: both HUD and CHA could be ordered to remedy the effects of their past discriminatory practices by siting, building, and financing low-income housing throughout the Chicago metropolitan area. In the proceedings before a magistrate, which began before the Supreme Court decision and went on for five years,[13] the additional relief was discussed and attempts were made to have CHA cooperate in implementing it.[14]

Throughout these twelve years of proceedings (1969–1981), CHA's response to orders by the court and the magistrate ranged from lethargic to obdurate. The record simply does not support CHA's version—that it was docile, even zealous, unless forces outside its control made obedience a complete impossibility (Reply Br. 9–11). Asked to evaluate CHA's compliance efforts, the magistrate recommended against finding CHA in contempt (Second Report, App. 49).[15] But she also found that "CHA site search and acquisition have neither been efficient nor vigorous and therefore not numerically productive" (Draft Final Report, App. 96); that, although some delay was "attributable to factors not within the complete control of CHA and HUD, [these factors] should have been anticipated by them and must be prepared for in the future because they continue" (*id.*, App. 98);

**11.** CHA takes an unjustifiably narrow view of the Supreme Court's language. "The fact that the court later ordered *HUD* to engage in metropolitan area relief does not detract from the completeness of the [1969] remedy against CHA." Reply Br. 8 (emphasis in original).

**12.** The Court noted, 425 U.S. at 298, n. 14, 96 S.Ct. at 1547, n. 14:

> Illinois permits a city housing authority to exercise its powers within an "area of operation" defined to include the territorial boundary of the city and all of the area within three miles beyond the city boundary that is not located within the boundaries of another city, village, or incorporated town. In addition, the housing authority may act outside its area of operation by contract with another housing authority or with a state public body not within the area of operation of another housing authority. Ill.Rev.Stat. c. 67½, §§ 17(b), 27c (1973).

**13.** CHA's penultimate appeal to this Court involved the district judge's reference of the case to Magistrate Olga Jurco. The reference antedated the Supreme Court's decision and directed the magistrate to determine if CHA was using its best efforts to comply with the 1969 order as modified and, if not, whether contempt proceedings would be appropriate. CHA asked this Court to issue a writ of mandamus, directing the district judge to retain the case himself. A divided panel declined to do so, 511 F.2d 82 (7th Cir. 1975).

**14.** It is evident from the magistrate's second, third, and (draft) final reports that the Supreme Court's decision did have an impact on the proceedings and that means of achieving metropolitan relief were considered and adopted thereafter. See App. 53 (joint voluntary efforts by CHA and HUD warrant postponing judicial action); App. 69 (CHA to request cooperation with suburban housing authorities, with CHA channeling federal subsidies to those authorities in exchange for commitment to reserve 50% of resulting units for *Gautreaux* plaintiffs); App. 72–76 (HUD and local authorities, including CHA, enter into Gautreaux Demonstration Program in Chicago and suburbs); App. 93 (of local authorities invited to cooperate with CHA, only Elgin responds positively, but later rescinds agreement).

**15.** CHA asserts that "[a]t no time in the history of this protracted litigation has CHA ever been charged with failing to comply with any order of the district court" (Br. 35). That is literally true but misleading.

and that "[t]he prevalent deterrent to CHA performance has been a reluctance to relinquish application of self-imposed criteria in the exercise of its judgment of what it concludes to be suitable remedial housing for plaintiff class as well as inefficient bureaucratic operation" (*id.*, App. 102). The most scathing indictment of CHA's compliance can be found in Judge Crowley's reluctant decision not to put CHA into receivership, 498 F.Supp. 1072, 1075 (N.D.Ill.1980):

> With great reservation, the motion to appoint a receiver is denied without prejudice. * * * Best efforts will no longer suffice; compliance [with the May 1979 modified order] will be measured by results, not intentions. Bureaucratic inefficiency will no longer be tolerated by the Court. The inaction of the CHA to date is a clear indication of indifference to the orders of this Court and to the rights of the citizens of Chicago.

Based on the foregoing, it is difficult to argue that this litigation ended in any practical sense with the 1969 orders, or that the succeeding stages were "supplemental." It is also hard to believe that no substantive issues remained open and unresolved in the fall of 1976. Quite apart from the dearth of remedial action, the scope of possible remedy had changed. Finally, it is impossible to treat the CHA's involvement in any of these issues as "marginal."

### Other Precedents

A comparison of the *Gautreaux* litigation with the cases on which CHA relies is also instructive. With one exception, they all involve much more discrete and conclusive lawsuits than we have found. Thus *Peacock, supra*, 433 F.Supp. 1072, dealt with a challenge by two plaintiffs to a school district policy of refusing to employ unwed mothers. Before the enactment of amended Section 1988, definite backpay and reinstatement relief had been ordered and the fee issue finally resolved. Only an effort to recover supplemental backpay was pending on October 19, 1976. The district judge found this too thin a wedge to open the entire litigation for the award of some $122,000 in fees, especially where "plaintiffs were free to effectuate their judgment for over one and one-half years prior to enactment of the 1976 Act." 433 F.Supp. at 1075.

In *Escamilla v. Santos*, 591 F.2d 1086 (5th Cir. 1979), a prisoners' Section 1983 suit had ended with a consent decree in July of 1976 and a memorandum order denying attorneys' fees in August of 1976. The district judge had amended his decision and granted fees after October 19, 1976, solely because the August memorandum order did not satisfy the technical requirements of a final judgment under Rule 58 of the Federal Rules of Civil Procedure.[16] The Fifth Circuit reversed, holding that a technical defect did not undermine finality where the judge and both parties clearly treated the order as final at the time it was entered.[17]

Finally, *Gonzales v. Fairfax-Brewster School, Inc.*, 569 F.2d 1294 (4th Cir. 1978), certiorari denied, 439 U.S. 927, 99 S.Ct. 311, 58 L.Ed.2d 320, involved plaintiffs' attempts to obtain fees, although the Court of Appeals had denied them, the Supreme Court had affirmed, and the Supreme Court's mandate had been returned to the district court—all before the Fees Awards Act's

---

**16.** Fed.R.Civ.Proc. 58 provides that "[e]very judgment shall be set forth on a separate document. A judgment is effective only when so set forth and when entered as provided in Rule 79(a)."

**17.** In a footnote, 591 F.2d at 1088, n. 1, the Court added: "The plaintiffs' October 1, 1976, motion concerning the appellants' failure to comply with the consent decree is in the nature of a supplemental proceeding to effectuate the prior consent judgment and is insufficient to make a pending active issue. See *Peacock v. Drew Municipal Separate School District, su-* pra." This note is not authority for CHA's contention that all proceedings after the 1969 order in *Gautreaux* were supplemental. First, no consent decree has been entered against CHA. The consent decree that has been formulated, 523 F.Supp. 665, appeal pending Nos. 81–2308, 81–2311, 81–2361 (argued May 10, 1982), binds only HUD. Second, the Fifth Circuit does not describe the nature of any noncompliance or the relief sought, factors that would be relevant to an assessment of whether litigation has been concluded.

effective date. Plaintiffs' theory, rejected by the Fourth Circuit, was that a pending motion for costs under 28 U.S.C. § 1920 preserved the attorneys' fee issue under the statute.

A fair comparison of these cases and the *Gautreaux* litigation readily suggests important differences. First, none appears to involve ongoing disputes about the propriety and efficacy of the relief initially granted.[18] Indeed only one could conceivably have involved relief that was long term or complicated, such that a court's retained jurisdiction would not only be provided for, but invoked.[19] Second, all three cases involve thinly-disguised attempts to generate an issue solely in order to come within the pendency rule. In *Gautreaux* the plaintiffs' unremitting pressure on CHA over twelve years—and their decision to ask for attorneys' fees only as the litigation draws to a close—bespeak no such opportunism. The Sixth Circuit's remark in *Northcross v. Board of Education of Memphis City Schools*, 611 F.2d 624, 635 (1979), certiorari denied, 447 U.S. 911, 100 S.Ct. 2999, 64 L.Ed.2d 862, could equally apply here: "[P]laintiffs' delay in applying for fees * * * was largely due to the fact that there was no earlier time to pause for litigation of the fee issue * * *."

CHA instances one case that is factually more similar to *Gautreaux* in which fees were nonetheless denied. There is however an important distinction, and it undercuts CHA's position. In *Henry v. Clarksdale Municipal Separate School District*, 579 F.2d 916 (5th Cir. 1978) (*per curiam*)

(*Clarksdale* V), the Fifth Circuit construed Section 718 of the Emergency School Aid Act, 20 U.S.C. § 1617, a fee provision applicable to school desegregation cases pending on July 1, 1972.[20] A majority of the panel held that plaintiffs' motion to require bus transportation by the School District, made after July 1, 1972, was not sufficient to render the litigation pending after that date. Apart from the motion, no active issues remained: "all definitive or substantive orders of the district court for desegregating the Clarksdale public schools as to students, faculty, staff, and services *had been entered and were being complied with*." 579 F.2d at 918 (emphasis added). The majority therefore affirmed the district judge's decision to award no fees for work done between 1964, when the suit was first filed, and 1972.[21]

Judge Tjoflat in dissent in *Clarksdale* V disagreed with the majority's treatment of the busing motion, finding it an integral step in the achievement of a unitary school system, rather than a supplemental enforcement effort. *Id.* at 921. He also thought the majority's characterization of the school district's compliance was naive:

[A] school system is not automatically desegregated when a constitutionally acceptable plan is adopted and implemented. "If the journey from *Brown* [Bd. of Ed. of Topeka, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083] to *Swann* [v. Charlotte-Mecklenburg Bd. of Ed., 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554] has taught us anything, it is that integration does not occur merely when and because we say it should."

---

**18.** *Peacock* involved supplemental back pay; *Gonzales* involved only attorneys' fees. *Escamilla* apparently involved fees as well, but see note 17 *supra*.

**19.** In *Escamilla*, the lawsuit challenged living conditions in the Webb County, Texas, Jail. The conditions, and what corrective measures were ordered, are not specified in the opinion. In contrast, *Peacock* involved two named plaintiffs' suit for reinstatement to employment; and *Gonzales* was the epilogue to *Runyon v. McCrary*, 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415, a suit by two black children denied admission to private Virginia schools because of race.

**20.** This provision and its retrospective effect are the subject of the Supreme Court's opinion in *Bradley, supra*, 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476.

**21.** The Court had affirmed the award of fees for work done after July 1, 1972, 480 F.2d 583, 585–586 (5th Cir. 1973) (*Clarksdale* IV). It apparently assumed before the decision in *Bradley* that the fee statute could not provide compensation for work done before its effective date. See 579 F.2d at 920 (Tjoflat, J., dissenting).

*Id.*, quoting *Thompson v. Madison County Board of Education*, 496 F.2d 682, 686 (5th Cir. 1974). Finally Judge Tjoflat believed that the majority was avoiding the plain import of the *Bradley* decision.[22] 579 F.2d at 920.

While we find ourselves in sympathy with Judge Tjoflat's position, we need not adopt it to determine that CHA's arguments are not advanced by *Clarksdale* V. CHA would have to show, as the School District did in the *Clarksdale* V majority's opinion, that "all definitive and substantive orders * * * had been entered and were being complied with" before October 19, 1976. As our summary of the *Gautreaux* litigation amply indicates, relief was still being formulated in 1976 and CHA compliance was minimal.

Finding CHA's precedents readily distinguishable, the district judge placed reliance instead on *Bolden v. Pennsylvania State Police*, 491 F.Supp. 958 (E.D.Pa.1980). There a lawsuit challenging the defendants' racially discriminatory hiring and promotion practices had been filed in 1973 and a consent decree entered in 1974. Nonetheless, the court treated the suit as still pending in 1976, for purposes of Section 1988, because "the consent decree expressly contemplated a continuing judicial proceeding." 491 F.Supp. at 961. The defendants were under court order to develop job-related hiring and promotion criteria, demonstrate the criteria's validity to the district judge, and then use them to remedy past discrimination. But

> [n]early six years after the entry of the 1974 consent judgment and four years

after passage of the 1976 Fees Awards Act, implementation of the class relief remains in the initial stage. Nor have plaintiffs been responsible for the delay in any way. Defendants have simply not fulfilled their obligation to develop and present to the Court evidence of valid, nondiscriminatory employment standards. *Id.*

In the absence of controlling precedent in this Circuit,[23] Judge Crowley was correct to recognize the distinguishability of the Fourth and Fifth Circuit cases and to rely instead on *Bolden*.[24]

*The Nature of Equitable Proceedings*

■ The district judge's decision is also consistent (and CHA's arguments are not) with the nature of modern suits in equity. When broad equitable relief is sought to remedy a constitutional violation, the remedy must be tailored to the scope of the violation. *Hills v. Gautreaux, supra,* 425 U.S. at 293–294, 96 S.Ct. at 1544–1545; cf. *Milliken v. Bradley (Milliken I),* 418 U.S. 717, 744, 94 S.Ct. 3112, 3126, 41 L.Ed.2d 1069; *Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 16, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554. With that caveat, however, the federal district judge acting as chancellor "has broad and flexible powers to mold each decree to the necessities of the particular case and to remedy the consequences of past constitutional violations." *Gautreaux v. Romney, supra,* 457 F.2d at 133 (Sprecher, J., dissenting). The reality in such cases, as we have learned primarily in the school desegregation con-

---

**22.** *I.e.,* he disapproved of the Court's adhering to the result it had reached earlier (note 21 *supra*), when the rationale for that result had been undercut completely by *Bradley.*

**23.** The chief basis for decision in *Bond v. Stanton*, 555 F.2d 172 (7th Cir. 1977), certiorari denied, 438 U.S. 916, 98 S.Ct. 3146, 57 L.Ed.2d 1161, was that the legislative history of the Fees Awards Act referred to the specific suit as an example of one in which awards for earlier work would be appropriate. *Id.* at 174. Fees had earlier been awarded because of the defendants' bad faith, 528 F.2d 688 (7th Cir. 1976), vacated and remanded in light of the Fees Awards Act, 429 U.S. 973—a justification that was unaffected by the *Alyeska* decision,

421 U.S. 240, 258–259, 95 S.Ct. 1612, 1622, 44 L.Ed.2d 141.

In *Dawson v. Pastrick*, 600 F.2d 70 (7th Cir. 1979), there was no dispute about the pendency of the case on October 19, 1976, because it was not resolved until 1977. We did, however, reject the defendants' argument that it would be inequitable to award fees for work going back to 1971, when the case was first filed.

**24.** *David v. Travisono*, 621 F.2d 464 (1st Cir. 1980) (*per curiam*), and *Northcross, supra*, 611 F.2d 624, are also consistent with the result reached by Judge Crowley. See 523 F.Supp. at 687, n. 2.

text, is that the finding of a constitutional violation is in a practical sense only the preliminary hurdle. The heart of the lawsuit is the remedial stage, where the parties struggle, often for years, over the scope and details of injunctive relief. Under such circumstances it is not uncommon for the parties to take no appeal from the initial liability determination—as the parties in *Gautreaux* did not—because they recognize the wisdom of husbanding their energy and resources for the true battleground. Cf., *e.g.,* *Pasadena City Board of Education v. Spangler,* 427 U.S. 424, 428, 96 S.Ct. 2697, 2701, 49 L.Ed.2d 599 (Board voted to take no appeal from district court's finding of liability and entry of initial injunction); *Bradley v. Milliken,* 468 F.2d 902 (6th Cir. 1972), certiorari denied, 409 U.S. 844, 93 S.Ct. 45, 34 L.Ed.2d 83 (after trial on the merits, 338 F.Supp. 582 (E.D.Mich.1971), initial appeal involved unsuccessful challenge to district judge's interlocutory order that desegregation plans be submitted; liability finding not challenged); *Bradley v. School Board of Richmond,* 345 F.2d 310, 313 (4th Cir. 1965), vacated on other grounds, 382 U.S. 103, 86 S.Ct. 224, 15 L.Ed.2d 187 (Board never challenged liability determination, but only whether it should have a reasonable opportunity to correct deficiencies without an injunction issuing).

The notion of pendency for Section 1988 purposes ought to bear some relation to this reality. Judge Crowley recognized as much when he resisted CHA's persistent efforts to "mischaracterize this case as a series of separate matters instead of recognizing it as a continuous litigation." 523 F.Supp. at 689.

We are mindful of the genuine concern, discernible in some of the cases on which CHA relies and in the dissenting opinion of Judge Pell, that an expansive view of pendency in equitable proceedings may permit long dormant cases to be reopened solely for the purpose of obtaining attorneys' fees that were not available when the cases were in active litigation. See, *e.g., Scott v. Winston-Salem/Forsyth County Board of Education,* 400 F.Supp. 65, 68 (M.D.N.C.

1974), affirmed without opinion, 530 F.2d 969 (4th Cir. 1975) (discussing 20 U.S.C. § 1617). But marginal cases can be left for another day: in *Gautreaux* there has been no hiatus or period of dormancy, and the issues pending in 1976 and after have been central to the merits, not supposititious.

■ Furthermore, an award of fees under the 1976 Act is addressed to the discretion of the district judge, and he may refuse them—or limit them—if special circumstances would make a full award unjust. *Newman v. Piggie Park Enterprises, Inc.,* 390 U.S. 400, 402, 88 S.Ct. 964, 966, 19 L.Ed.2d 1263. The question then becomes what circumstances are "special" in a retrospective award of fees? Surely not the duration and expense of the litigation, once it is found to have been pending on the relevant date—otherwise the Congressional purpose would be subverted by judicial fiat. As the First Circuit has observed, "once the door to the Fees Act is opened, a full inquiry as to plaintiffs' entitlement to an award [is] in order. It is of no moment that the services in question were rendered almost entirely prior to the effective date of the Act." *David v. Travisono,* 621 F.2d 464, 468 (1st Cir. 1980) (*per curiam*). Surely also not a party's expectation at the outset of the litigation that fees would not be awardable, "since there is no indication that the [statutory] obligation * * *, if known, * * * would have caused [the party] to order its conduct so as to render [the] litigation unnecessary and thereby preclude the incurring of such costs." *Bradley, supra,* 416 U.S. at 721, 94 S.Ct. at 2021. The *Northcross* Court, *supra,* 611 F.2d at 635, has suggested several factors that would qualify: the entry of final orders disposing of interim aspects of prolonged cases, including attorney fee claims; the presence of potentially liable defendants who have joined the litigation principally as *amici curiae*; or the existence of delay that causes demonstrated prejudice to the defendants.

CHA has not argued that special circumstances, in the sense described above, make

the award of fees against it unjust.[25] As we have recently had occasion to remark, "the burden of demonstrating the existence of special circumstances is on the defendant * * * and the 'special circumstances' limitation of section 1988 is applicable only to unusual cases." *Crosby v. Bowling*, 683 F.2d 1068, 1072 (7th Cir. 1982). Instead CHA has concentrated its fire on the argument that the case was not pending at all on October 19, 1976—or that if certain portions of the case were pending then, the *Gautreaux* plaintiffs were not prevailing parties—thus making the award of fees legally improper. We find Judge Crowley's contrary decision that the entire litigation in which plaintiffs did prevail was open to a fee award more consistent with Congressional purpose, the *Gautreaux* case itself, the relevant precedents, and the powers of a court of equity.

## II

CHA's second line of defense is that the *Gautreaux* plaintiffs' fee application was untimely. The argument proceeds as follows: attorneys' fees under Section 1988 are "costs" governed by Rule 54(d) of the Federal Rules of Civil Procedure,[26] *Hairline Creations, Inc. v. Kefalas*, 664 F.2d 652, 659–660 (7th Cir. 1981). Rule 54(d) has no intrinsic time limit, but Rule 45 of the General Rules of the Northern District of Illinois requires that a motion for "costs" be filed within ten days of entry of a judgment allowing costs. Failure to file in time waives "costs other than those of the Clerk, taxable pursuant to 28 U.S.C. § 1920."

Therefore, according to CHA, at least since 1973 when Local Rule 45 took effect, the *Gautreaux* plaintiffs should have filed motions for attorneys' fees within ten days of each order entered in the case.

There are two defects in this argument. First, neither Judge Crowley in this case, 523 F.Supp. at 689, nor Judge Marshall in *Independent Voters of Illinois v. Chicago Housing Authority*, No. 76 C 3683 (N.D.Ill. Jan. 31, 1979) (unpublished but reproduced in CHA App. at 114–124), has subscribed to CHA's construction of Local Rule 45. They treat Rule 45 as applying only to Judicial Code Section 1920 costs (a category that does not include attorney's fees), and a late Rule 45 motion as waiving four of the five kinds of costs otherwise recoverable under Section 1920. In short, Rule 45 has nothing whatsoever to do with a motion for attorney's fees under Section 1988. Cf. the discussion in *Metcalf v. Borba*, 681 F.2d 1183 (9th Cir. 1982).

Another problem with CHA's timeliness argument, which Judge Crowley recognized, 523 F.Supp. at 689, is that these fees are being sought *pendente lite, Hanrahan v. Hampton*, 446 U.S. 754, 100 S.Ct. 1987, 64 L.Ed.2d 670, and not at the conclusion of the litigation. That is, the event that triggers the time limit of Rule 45, even if the rule were applicable, has not yet occurred: no judgment allowing costs has been entered. To be sure, the original injunction and its modifications have provided that costs will be assessed against CHA when they are determined,[27] but that time has not

---

**25.** CHA does make a laches argument in a somewhat different context. See Part II *infra*.

**26.** Rule 54(d) provides:

> *Costs.* Except when express provision therefor is made either in a statute of the United States or in these rules, costs shall be allowed as of course to the prevailing party unless the court otherwise directs * * *. Costs may be taxed by the clerk on one day's notice. On motion served within 5 days thereafter, the action of the clerk may be reviewed by the court.

**27.** Paragraph XI of the 1969 injunction provides that "[t]he costs of this action shall be taxed against CHA, *subject to further orders of*

*this court.*" 304 F.Supp. at 741 (emphasis added). An illustration of how the costs provision works can be found in the May 19, 1978, order (App. 109), dealing with the compensation of an urban housing expert:

> (4) The compensation to be paid to the expert shall be fixed by further order of this Court. The expert may, however, apply from time to time to the Master for compensation and reimbursement of expenses and shall keep records of time spent.
> (5) Pursuant to Article XI of this Court's order of July 1, 1969, the compensation and expenses of the expert, as approved by the Master and ordered by the Court, shall be

yet arrived. In other words, in its timeliness argument—as in its pendency argument—CHA has overestimated the discreteness of the various stages of this litigation.

■ Absent a fixed time limitation, the only constraint on when the plaintiffs file for attorneys' fees under Rule 54(d) of the Federal Rules is laches (CHA Br. 32). A laches claim must demonstrate both undue delay and prejudice to the non-delaying party, *Advanced Hydraulics, Inc. v. Otis Elevator Co.*, 525 F.2d 477, 479 (7th Cir. 1975), certiorari denied, 423 U.S. 869, 96 S.Ct. 132, 46 L.Ed.2d 99. Here CHA can show neither. A motion for fees *pendente lite* is presented early rather than late: "the party to whom the fees [are] awarded [has] established the liability of the opposing party, although final remedial orders [have] not been entered." *Hanrahan, supra*, 446 U.S. at 757, 100 S.Ct. at 1989. The logic behind such an interim award must be that, although it is premature in a sense, the plaintiff is sufficiently likely to prevail ultimately that he (or his lawyers) should be relieved from financial hardship until then. Prematurity and laches are antinomical concepts.

■ CHA also does not succeed in demonstrating prejudice from the timing of the fee application. It instances only Mr. Polikoff's claim for forty hours spent on reconstructing his hours from 1965 to 1980 (Br. 32, n.*). Less than three hours per year strikes us as fast work by Mr. Polikoff: he could not reasonably have been expected to spend less time constructing an earlier petition for fewer hours. It is much more likely, as appellees point out, that CHA has benefited from the timing: "in th[e] reconstruction, Mr. Polikoff omitted many hours he could no longer recall or document." (Br. 16; cf. Polikoff affidavit, CHA App. at 5.)

borne by defendant CHA and taxed as costs in this action.

28. The total hours claimed are 3,003, all related directly to the litigation against CHA (see note 2 *supra*). The district judge noted that "from this court's personal observations the figure, at least since 1976 [when Judge Crowley first became involved in the case], is conservative in the extreme." 523 F.Supp. at 684.

## III

■ Having found that the Fees Awards Act applies to this litigation and that the fee petitions were filed at an appropriate time, it remains only to consider CHA's arguments about the actual amount of the award. This last step of our review asks only whether the district judge's fee award under Section 1988 amounted to an abuse of discretion.

CHA's main contentions are that (1) an hourly rate of $125, though it concededly "is not excessive in the current market for legal services," is too high for all the work done over a fourteen-year period; (2) the fees should be limited because they are to be paid to ACLU and BPI, two not-for-profit organizations; and (3) the fees should be reduced because of the financial difficulties CHA is experiencing (Br. 35–36; quoted language at 35). These arguments were all fully aired before the district judge, and we cannot fault his resolution of them.

It is appropriate in this case to award a current hourly rate (rather than various historical rates) for all the hours claimed. In the first place, the appellants' attorneys have had no fees at all during an intensely inflationary period. The use of current market rates in comparable circumstances has been approved in *Copeland v. Marshall*, 641 F.2d 880, 893 & n. 23 (D.C.Cir.1980) (*en banc*); *Northcross, supra*, 611 F.2d at 635; *Hernandez v. Finley*, slip op. No. 74 C 3473 (N.D.Ill. Feb. 20, 1981) at 4; *Custom v. Quern*, 482 F.Supp. 1000, 1006 (N.D.Ill.1980) (*semble*). In the second place, the compensation awarded multiplies the minimum number of hours Mr. Polikoff worked by the hourly rate,[28] and Mr. Polikoff stands as a surrogate for the teams of volunteer law-

The dissent says that the claimed hours "could only charitably be called an educated guess" (p. 616 *infra*). Neither at trial nor on appeal did CHA challenge the accuracy of the affidavit or the records to support it. CHA Br. 4, 32. The dissent's preference for "*contemporaneous*, complete and standardized time records" (p. 616 *infra*) is difficult to square with *any* retroactive application of the Fees Awards

yers who have staffed the *Gautreaux* case since its inception.[29] Thus CHA is not being penalized: it has had the use of its money until now, which should offset the application of current hourly rates; and it is not being required to pay for all the legal help plaintiffs have had. CHA also objects to the uniform $125 rate because the plaintiffs had no entitlement to fees until 1976 and delayed petitioning for them until 1981. These grounds simply restate the timeliness argument (Part II *supra*) and take issue once again with Congress' stated intent in enacting the Fees Awards Act (Part I *supra*).

The notion that fee awards should be reduced where they are to be paid to not-for-profit organizations has been rejected by every court of appeals to consider it. See *Copeland v. Marshall, supra,* 641 F.2d at 896–900, especially the catalog of precedents under various fee statutes at 900.[30] Three judges in the Northern District of Illinois have similarly rejected the argument: *Dietrich v. Miller,* 494 F.Supp. 42, 44 (N.D.Ill.1980) (Bua, J.); *Custom v. Quern, supra,* 482 F.Supp. at 1002–1005 (N.D.Ill. 1980) (Marshall, J.); and *Lackey v. Bowling,* 476 F.Supp. 1111, 1116–1117 (N.D.Ill. 1979) (Grady, J.). We take this opportunity to make explicit what was implied in *Hair-*

*ston v. R & R Apartments,* 510 F.2d 1090, 1093 (7th Cir. 1975) (construing 42 U.S.C. § 3612(c)): the Seventh Circuit should be added to *Copeland's* roster.

The financial difficulties of CHA are alluded to only in passing in the brief on appeal (Br. 36). CHA apparently does not argue that its plight warrants a flat denial of fees—a position that is foreclosed by *Entertainment Concepts, Inc., III v. Maciejewski,* 631 F.2d 497, 507 (7th Cir. 1980), certiorari denied, 450 U.S. 919, 101 S.Ct. 1366, 67 L.Ed.2d 346. Rather it argues that the district judge, who awarded plaintiffs the least amount requested[31] "in recognition of CHA's limitations," 523 F.Supp. at 691, should have cut the figure back still further. CHA has submitted no information that might even tempt us to second-guess the district judge on this issue, and of course second-guessing a discretionary decision is not the role of a reviewing court. *Harrington v. DeVito,* 656 F.2d 264, 269 (7th Cir. 1981), certiorari denied, —— U.S. ——, 102 S.Ct. 1621, 71 L.Ed.2d 854 ("Generally, an abuse of discretion only occurs where no reasonable person could take the view adopted by the trial court."). Judge Crowley considered CHA's financial hardship argument and adjusted his award accordingly.[32] That satisfies us.

Act. Under that interpretation, counsel would have to be prescient as well as successful.

**29.** See note 1 *supra.* In addition to volunteer attorneys not of record, law clerks, and other support personnel, the attorneys of record include Charles Markels, Bernard Weisberg, Milton I. Shadur, Merrill A. Freed, Roger Pascal, Robert J. Nollen, Douglas W. Cassel, Jr., Elizabeth Lasser, and Howard A. Learner.

**30.** Cf. *Nottelson v. Smith Steel Workers D.A. L.U.,* 19806, 643 F.2d 445, 447 (7th Cir. 1981), certiorari denied, 454 U.S. 1046, 102 S.Ct. 587, 70 L.Ed.2d 488 (district court's award of fees under Title VII correct, despite defendants' argument that they would be paid over to Seventh-Day Adventist Church and thus violate Establishment Clause); *Northcross, supra,* 611 F.2d at 637 (district court denial of fees to NAACP Legal Defense Fund improper; trial court's basis for denial apparently that NAACP lawyers provided duplicative services).

Recently the Third Circuit has invalidated on public policy grounds a contractual agreement between Community Legal Services (CLS) and

the Pennsylvania state agency that funds CLS. The contract disabled CLS, a not-for-profit legal services organization, from requesting or accepting fees under Section 1988. *Shadis v. Beal,* 685 F.2d 824 (3d Cir. 1982).

**31.** The fee petition asked for $125–$175 per hour in light of the "skill, education and experience [of counsel] and the complexity of the case." 523 F.Supp. at 685. That would produce a basic figure of $375,375–$525,525. It suggested that any further adjustments in the basic figure should be upward rather than downward.

**32.** In the district court CHA also argued that, as a consequence of its straitened financial condition, the fee award would have come out of funds that would otherwise provide low-income housing for the plaintiffs. That is potentially true in any case in which the body required to pay has the ability to shift its costs. What is equally true is that without legal help the *Gautreaux* plaintiffs would probably never have obtained any relief at all. 523 F.Supp. at 691.

## CONCLUSION

The district court correctly determined that *Gautreaux v. CHA* was a pending case on October 19, 1976 and that plaintiffs were prevailing parties though the litigation was not yet over. Accordingly, it was possible under Section 1988 to award fees *pendente lite* to plaintiffs' lawyers. No special circumstances existed to make the award of fees for the entire course of the litigation unjust, and there was no abuse of discretion in the determination of the amount of the award. CHA's liability for $375,375 in attorneys' fees is affirmed; costs to appellees.

PELL, Circuit Judge, dissenting.

In this case the parties do not disagree with the majority opinion that in enacting 42 U.S.C. § 1988 Congress intended that a district court have the *discretion* to award attorneys' fees to a *prevailing party* in civil rights cases *pending* before district courts on the 1976 effective date of the section, including fees for work performed before that date. On the facts of this case, which I do not view in quite the same way as does the majority opinion,[1] it appears to me that the district court's allowance of fees of $375,375 to the plaintiffs for work of which approximately two-thirds had occurred during a period spanning a full decade prior to 1976, rendered under the sponsorship of two not-for-profit organizations, neither of which, nor their attorneys, during that decade, expected to be compensated by the opposing party, goes beyond the reasonable boundaries indicated by the Congressional intent. I therefore respectfully dissent.

It is true that the case in the district court, which was filed in 1966, was still carried on the docket of the court in 1976 and at the time the fee award was made in 1981. Indeed, this situation remains true to this date. It is not an unusual experience in injunctive cases for a court to retain continuing jurisdiction to see that a dispositive decree is in fact implemented. The majority properly noted that other cases have been concerned that a too expansive view of pendency in equitable proceedings may not provide the basis of a claim for attorneys' fees, this being true even though the issues which brought about the litigation have long since been settled with the court retaining only supervisory jurisdiction for implementation purposes.

In the present case the plaintiffs in 1969 had a judgment entered in their favor permanently enjoining the CHA from invidious discrimination on the basis of race in the conduct of the public housing system. The CHA was ordered to use its best efforts to increase the supply of dwelling units as rapidly as possible in conformance with the judgment. The court retained jurisdiction:

> for all purposes, including enforcement and issuance, upon proper notice and motion, of orders modifying or supplementing the terms of this order upon the presentation of relevant information with respect to proposed developments designed by CHA alone or in combination with other private or public agencies to achieve results consistent with this order, material changes in conditions existing at the time of this order or any other matter.

304 F.Supp. at 741.

The majority opinion recognizes the propriety of the test laid down in *Peacock v. Drew Municipal Separate School District*, 433 F.Supp. 1072 (N.D.Miss.1977), aff'd, 611 F.2d 1160 (5th Cir. 1980) (per curiam) for determining the requisite pendency. The parties do not seem to disagree that the case would be pending if there was an "active" issue that had not been finally resolved at the critical time. An "active" issue was defined in *Peacock* as being:

---

1. In viewing the facts, we are concerned with whether the case against CHA was pending in October 1976 within the meaning of the Congressional intent. To do so we must look at the record of the proceedings. I regard the issue as not being a question of whether the district court abused its discretion, or whether its find-ings—and the record should speak for itself in that respect—were clearly erroneous, but whether as a matter of law that record reflects such pendency as will breathe life—and fees—into litigation which was no longer pending in the sense of the relief which precipitated it still being sought.

We interpret "active" issue to mean a substantive claim upon which a district court has not acted, either in the first instance or on remand, or a substantive claim whose disposition by the district court, or Court of Appeals, either is on appeal or is appealable. The mere pendency on the date of enactment of an attorney fees act of supplemental proceedings to effectuate a prior final judgment is not, in our opinion, sufficient to convert an action into such a "pending action" as to warrant an award of attorney fees under such act pursuant to *Bradley*-type retroactive application of the act.

*Id.* at 1075.

As in *Peacock*, it appears to me from an examination of the record that proceedings subsequent to the judgment in 1969 were "nothing more than providing for enforcement of defendants' previously established liability." *Id.* It is true that implementation did not occur with any rapidity. Factors, however, beyond the control of the CHA entered into the picture including a recalcitrant city council and a moratorium on new federally financed public housing. At this point it is appropriate to refer to a factor which the majority opinion seems to blur into insignificance, and that is that there were two separate suits originally filed by the plaintiff Gautreaux—one against CHA, which is all we are concerned with here, and the other against the Department of Housing and Urban Development (HUD). The two cases were, in 1971, consolidated. At that time the district court was not contemplating any changes in the relief ordered in 1969 against CHA and was attempting to formulate a remedy in the case against HUD. This effort continued for many years. While the remedy against HUD was not formulated until long after October 1976, the fact that CHA willy-nilly was a party in the same action with HUD should not affect its liability for fees simply because the HUD case was still viable in 1976.

In the district court, the plaintiffs themselves recognized the two cases should not be treated as one for purposes of awarding attorneys' fees by specifically excluding from the hours for which compensation was claimed the time spent on proceedings in the companion case against HUD.

Leaving aside the case against HUD, it appears to me from the record that all of the proceedings against CHA within the relevant period from October 1976 to the present were in the nature of supplemental enforcement proceedings to effectuate a prior judgment final as to liability. The main part of those proceedings consisted of appearances before a Master at which the only goal was the "exploration of possible alternative courses in a difficult area" with a view to a final report for "possible use by the district court." There is no indication that a more comprehensive remedy with respect to CHA was being formulated or, indeed, was ever formulated. In simple language, the 1969 order was intended to be, and in fact was, a comprehensive remedy designed to terminate the past effects of discrimination in the CHA system and prevent discrimination in the future.

By October 1976, the remedy against CHA had been fixed for more than six years. Although plaintiffs continued, of necessity, to be involved in the litigation pertaining to enforcement, it does not seem to me to be within the Congressional intent that this activity should be used to create retroactive liability for a long-past decade of legal work. Even more simply, there were no substantive claims pending in October 1976 insofar as CHA was concerned. It is of interest to note that the majority opinion chooses to distinguish cases from other circuits which have addressed generally the present matter and place principal reliance, as the district judge, on a district court case, *Bolden v. Pennsylvania State Police*, 491 F.Supp. 958 (E.D.Pa.1980).

The majority opinion brushes aside in a marginal note the secondary contention of CHA that if any aspects of this suit could be considered pending in October 1976, they were only, at best, supplemental proceedings in which the plaintiff did not prevail as required by Section 1988. Although CHA

was forced into a four-year round of hearings before the Master, those hearings ultimately resulted in no order of any kind from the district court. An eventual modification of the 1969 order, not in a substantive but in a remedial enforcement sense, resulted not from the plaintiffs' efforts but followed CHA's resolution of its difficulties with HUD that made it possible for CHA to develop the plan that was accepted by the district courts and the plaintiffs to implement the 1969 decree.

I feel certain that the dockets of the district courts around this country reflect many cases which remain under the necessary continuing supervision of a district judge even though the substantive issues which brought about the litigation have been disposed of long prior to October 1976. I decline to believe that the Congress intended to stand the 1976 amendment on attorneys' fees on its head by opening these cases to attorneys' fees going back to the institution of suit with the fees to be awarded on a monetary basis reflecting an unrealistically inflated amount inapplicable to the time at which the bulk of the services was rendered.

Finally, I am concerned by what is evident in this case of policy reasons for not expanding Section 1988 into the dim past to encompass work which not-for-profit organizations[2] have performed with no expectation of securing attorneys' fees as a result of which no accurate recordation of hours spent has been maintained. Thus, in this case it appears that the lead counsel had to rely upon what could only charitably be called an educated guess. I think the proper standard is set forth in *National Association of Concerned Veterans v. Secretary of Defense*, 675 F.2d 1319 (D.C.Cir.1982) where the court states "attorneys who anticipate making a fee application must maintain *contemporaneous*, complete and standard-

ized time records which accurately reflect the work done by each attorney." (Emphasis supplied.) At 1326.

---

2. I am not unmindful of case law holding that even though public interest organizations were willing to undertake cases such as the present prior to 1976 without expectation of securing attorneys fees, they, nevertheless, may now be entitled to such fees, even though such fees have windfall aspects; nor am I unmindful that cases have held that these fees may be substantially keyed to rates current at the time of the award although the services substantially antedated that period, but viewing the payment order in this case I cannot regard it as other than incorrect under the law.